861 A.2d 827

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. LEARDEE D. JENKINS, DEFENDANT–
RESPONDENT.

Argued September 28, 2004—Decided December 16, 2004.

114

*Carol M. Henderson,* Assistant Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Linda Mehling,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court.

In this case, a distraught juror advised the trial court during a break in deliberations that she could not follow the court's instruc-

tions on the law and render a verdict based on the evidence free of "passion, prejudice, bias, or sympathy." The juror explained that she was a "black woman," that defendant reminded her of her own children, and that she could not "see another young black man going to jail for something really stupid." For those reasons, she stated that she could not convict defendant under any circumstances. After a lengthy colloquy with the juror, the court declared that she was unable to continue pursuant to *Rule* 1:8–2(d)(1), and replaced her with an alternate juror. Twenty-three minutes later, the reconstituted jury found defendant guilty of the crimes charged. The Appellate Division reversed defendant's convictions on the ground that, absent physical illness, the juror's emotional inability to follow the court's instructions did not constitute a valid basis for discharge. We disagree. The juror's admission that her emotional state rendered her unable to abide by her oath and to follow the law was a sufficient basis for her removal from the jury under *Rule* 1:8–2(d)(1). We hold, however, that replacing the discharged juror with an alternate was not a permissible option because the jury's deliberations had proceeded so far towards completion that a reconstituted jury would not have been capable of considering defendant's guilt or innocence anew, as required by our case law. We, therefore, affirm the reversal of defendant's convictions and order a new trial.

## I.

### A.

At trial, the State presented evidence that on the evening of November 27, 2001, seventeen-year-old defendant Leardee Jenkins and his friend Michael Tatum, armed with kitchen knives and wearing multiple layers of clothing and masks made out of "wave caps," entered a Foot Locker shoe store in Franklin Township, Somerset County. Tatum approached the shift manager, threatened her with a butcher's knife, and demanded money from the cash register. Defendant simultaneously held a smaller, serrated knife to the stomach of another employee. While fumbling with

the cash register key and backing up to avoid the point of Tatum's knife, the shift manager knocked over a store display. Customers, alerted to the robbery, took advantage of the commotion to dash from the store. Apparently unnerved by those events, defendant and Tatum also fled. A store employee called the police, who responded to the scene immediately.

Several blocks from the Foot Locker store, the suspicions of two Franklin Township police officers were aroused by defendant who was walking briskly without a jacket on that cold November evening. The officers stopped defendant, who told them that a man with a knife had been chasing him. The officers decided to place defendant in the back of their patrol car while they investigated. Later, when defendant was removed from the patrol car, an officer found a black wave cap in the car. A Foot Locker employee identified the wave cap as the one worn by one of the robbers.

Not far from the Foot Locker store, a police officer detained Tatum, who was wearing a black wave cap but no coat. Sometime afterwards, in two separate locations, the police found the clothing and weapons defendant and Tatum had discarded. The Foot Locker shift manager identified a nine-inch knife with a black wooden handle as the weapon wielded by Tatum.

At Franklin Township police headquarters, in the presence of his mother, defendant confessed that he had planned to rob the Foot Locker store with Tatum, but claimed that Tatum was the moving force behind the scheme. Defendant explained that in addition to arming themselves with knives, they disguised their identities by wearing wave caps, extra layers of clothing, and white socks over their hands. After the aborted robbery, they disposed of that clothing. Defendant minimized his involvement, denying that he threatened the store employee with a knife and stating that he ran from the store thirty to thirty-five seconds after entering it.

At trial, defendant presented a renunciation defense. He testified that Tatum came to his house with the plan and the gear to

commit the robbery and that he agreed to serve as a lookout because he "[n]eeded money." Defendant claimed that after entering the store and observing Tatum approach the employee with a knife he got cold feet and fled.

Defendant was charged as a juvenile with offenses related to the robbery of the Foot Locker store. After a waiver hearing in the Family Part, jurisdiction was transferred to the Law Division. A Somerset County grand jury indicted defendant for first-degree robbery (*N.J.S.A.* 2C:15–1), third-degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4d), and second-degree conspiracy to commit robbery (*N.J.S.A.* 2C:5–2).

After a three-day trial, the jury convicted defendant on all charges. The trial court merged the weapons possession and conspiracy charges into the robbery conviction and imposed a twelve-year State Prison sentence subject to the No Early Release Act, making defendant ineligible for parole until he served 85% of his sentence.

## B.

The facts relevant to this appeal concern the discharge of juror number nine. During the jury selection process, in response to questions from the court, the prospective jurors agreed to apply the court's instructions on the law "without reference to [their] own feelings about the law." Each prospective juror agreed to render a verdict "in accordance with the evidence" and "without any passion, prejudice, bias, favor, sympathy of any kind to either side." After the jury was selected and sworn, the jurors were reminded of their duty to abide by the court's instructions on the law and to consider the evidence without resort to "passion, prejudice, bias, favor or sympathy." That admonition was repeated yet again after summations, at which time the court asked the jurors to keep the promise they had made at the trial's beginning to render "a fair and impartial decision based on the evidence."

The jury began deliberating at 11:38 a.m. and recessed for lunch from 12:30 p.m. to 1:30 p.m. Shortly after lunch, the jury foreperson sent a note to the court stating that one juror "has the emotions to affect judgment. Must speak to the judge at side bar." The court then asked to meet with that juror. Juror number nine was brought into the courtroom, and the court engaged in a lengthy colloquy:

THE COURT: Come on over. We had a note that there was some problem. I didn't know what it was.

THE JUROR: I thought I could make this decision without emotion, but I can't.

THE COURT: You don't feel you can make a decision here?

THE JUROR: I can't agree with what they want. I can't do it.

THE COURT: You are not required to agree with what they want. Nobody is, you know, forcing you to agree with what they want. Everybody wants you to vote your own decision in the case. Is there some other problem?

THE JUROR: I'm confused.

THE COURT: You are confused?

THE JUROR: So we have to have a unanimous decision, but—

THE COURT: It's a criminal case, and in civil cases they have majority vote. In criminal cases it has to be a unanimous decision.

THE JUROR: It's a very emotional thing for me. I am a black woman. I have children [defendant's] age. I—I just can't make a decision to put him in jail. I can't do that. I can't do that. Sorry.

THE COURT: Actually—you have a tissue there, Sue?

(Pause in proceedings for juror to collect herself.)

THE COURT: Well, you understand what the jury charge was; that you decide the case based on the facts and you apply the law to the facts. Now, is it just that you feel that you have kids his age and it's difficult for you to make the decision on the facts, or what is it?

THE JUROR: I can't separate all the other options from the facts. You know, he's a young kid. He did something really stupid, I understand that. Yes, he did something wrong, I understand that. But there doesn't seem to be any room in what we've been asked to do to give the kid a break. I just, you know—I see another young black man going to jail for something really stupid when there is some really serious crimes out there. They are just walking around lolligagging, you're free, you know, doing whatever. Like I said, it's a very emotional thing. I just—

THE COURT: Well, certainly none of us could advise you how to vote. You have to vote how you choose to vote. Nobody here is telling you to vote one way or the other.

THE JUROR: So what are you telling me?

THE COURT: Well, what I'm telling you is that when we gave you—when we talked to you about jury selection, we indicated that you had to decide the case—

THE JUROR: And I had no idea I was going to have this difficulty, believe you me. It hit me by surprise.

THE COURT: Okay.

THE JUROR: I don't consider myself the emotional type. I am really embarrassed to be standing here like this.

THE COURT: That's okay. That's all right. That's all right. We did indicate that you can't decide the case based on bias, favor, or sympathy to one side or the other. We did indicate that to you.

With regard to this, as far as the sentence is concerned, if the defendant is found guilty, the sentence will be up to the Court, and the Court at that time will listen to both attorneys and the defendant and listen to everybody's position, and then consult the statute to figure out what sentence would be appropriate. So if you're focusing on what the sentence is going to be, none of us know what the sentence is going to be at this point. We would have to wait if he's found guilty, go through the presentence report, listen to the arguments of counsel.

The juror, who had been crying at sidebar, was then excused while the court conferred with counsel. The court resolved to remind the juror of her duty to decide the case without resort to bias, prejudice, or passion, and that she should vote her own conscience. Upon juror number nine's return to sidebar, the following exchange occurred:

THE COURT: As I indicated to you, nobody is telling you to vote one way or the other. You strictly vote how you see the case, how you see the evidence in the case.

You know, when you agreed to be a juror in the case, you indicated that you would decide the case fairly and impartially to both sides based on the evidence, not based on sympathy for either side. So I am going to ask you to go back and continue those deliberations. You feel that you can do that?

THE JUROR: (Shakes head.)

THE COURT: You don't feel that you can?

THE JUROR: (Shakes head.)

THE COURT: Can you explain that to me a little further, aside from what you already said? I've heard that part. It's just too emotional for you?

THE JUROR: Essentially.

THE COURT: Is there anything that we can do to assist you in your deliberations?

THE JUROR: I don't think so. I know—you know, I just—I just can't see where this kid is going to get a break, that's all. I just—you know, if everybody else wants to send him to jail, let them do it, but I can't be responsible for that. I just—I won't do that.

THE COURT: So I take it it's not a decision with regard to the facts and the evidence and the proofs in the case; it's more of an emotional response with you?

THE JUROR: Yes, it is. I said that. Absolutely.

THE COURT: Okay. And you don't feel going back in there, continuing deliberations—

THE JUROR: They are not—no, I don't see—how is that going to change anything?

THE COURT: I am just asking. I don't know. I am not in there.

MR. COOPER [counsel for Jenkins]: Could I ask? Was a vote taken already? I mean it seems—

THE COURT: I can't ask the juror what the vote was. Can't tally the vote either.

MR. COOPER: It would seem to me if we had a vote and where we are at a deadlock—

MR. DEMARCO [prosecutor]: Judge, that is inappropriate. Counsel should realize that, as far as the deliberations.

THE COURT: Right. They are still in deliberations.

MR. DEMARCO: That's correct. And there are certain things that are—that are required for this system to work, and that's one thing that is not to be infringed upon.

THE COURT: That's true. I take it as far as the facts of the case are concerned, setting aside the emotional aspect of the case, but strictly the facts, I take it that you participated in those deliberations and you've solved the facts, dilemma, for yourself?

THE JUROR: Pretty much.

THE COURT: Okay. So are you telling me that what's interfering with your ability to continue is your emotional reaction to the defendant, his age, your identity with him.

THE JUROR: Uh-huh.

THE COURT: Okay. And if I have it right from what you are telling me is that if you go back into that deliberating room there is nothing, nothing with regard to further deliberations that would change that aspect of the case?

THE JUROR: U[h-h]uh.

Juror number nine was excused again while the court and counsel surveyed the situation. The prosecutor argued that the juror should be removed because she would not comply with her oath to follow the court's instructions on the law. Defense counsel countered that juror number nine "made a decision" and should not be disqualified because the remaining jurors were not "considering any of the other options." The court decided to continue the dialogue with the juror:

THE COURT: It's just a couple more questions because we've been talking about it trying to figure out what to do with this.

With regard to the problem in continuing deliberations, with regard to that, you've indicated to me that it would be fruitless; you would be unable to go back and continue deliberations.

THE JUROR: Expand on that. I mean, what do you mean by—

THE COURT: Well—

THE JUROR: I would—I could go back, but I am gonna—not gonna change my mind or nothing that is going to make me feel any different.

THE COURT: Okay. Well, let me just ask this question. If you went back into deliberations, do you feel that you would be talking about the facts and the evidence in the case or it's just this emotional aspect?

THE JUROR: No. No facts. U[h]-uh. I mean, the facts are what they are. That wouldn't—it's not going to change how I am feeling one way or the other.

THE COURT: Okay. Are any of the other jurors putting any pressure on you?

THE JUROR: No, no, absolutely not. No.

THE COURT: They are not pressuring you at all?

THE JUROR: No, no, no.

THE COURT: So do I have it right, that as far as the decision on this case is concerned, that it's just down to the emotional aspect; that you are not willing to vote the way that you would otherwise vote because you have this identity with the defendant?

THE JUROR: Uh-huh.

THE COURT: Other than that, you would vote?

THE JUROR: Vote what?

THE COURT: With the other jurors I take it.

THE JUROR: Say that again.

THE COURT: But for the emotional factor, would this case already be resolved?

THE JUROR: Yeah.

THE COURT: Okay. So, basically if I have it right, what is preventing you from finishing out deliberations is your emotional involvement with the case—

THE JUROR: Uh-huh.

The prosecutor supported and defense counsel opposed discharging the juror from the jury panel. The court noted that juror number nine had indicated that "she would not decide the case based on the facts or evidence" and that she was "having a severe emotional response to the fact that she is a black woman and this is a young black man and she's not going to be involved in a case that would send another young black man to prison." On that basis, the court determined that the juror was "unable to

continue according to the case law" and removed her from the panel.

An alternate juror was selected to replace juror number nine. The court then charged the jurors that they should "set aside and disregard all past deliberations and begin [their] deliberations anew, just as if [they] were now entering the jury deliberating room for the first time." Twenty-three minutes later, the newly constituted jury returned a guilty verdict on all three counts.

The Appellate Division reversed defendant's conviction and held that the juror's "apparent inability to allow her intellect to overcome her sympathy and bias for the defendant" was not a valid basis for her removal from the jury pursuant to *Rule* 1:8–2(d)(1). *State v. Jenkins,* 365 *N.J.Super.* 18, 26, 837 *A.*2d 1125 (App.Div. 2003). The panel concluded that in such circumstances, juror substitution was not a permissible option, and that the trial court had to choose between declaring a mistrial and allowing continued deliberations. *Id.* at 27, 837 *A.*2d 1125. We granted the State's petition for certification. *State v. Jenkins,* 179 *N.J.* 369, 845 *A.*2d 1252 (2004).

## II.

We now determine that a trial court must remove a deliberating juror who unequivocally expresses her unwillingness or inability to put aside bias and passion and follow the law. As will be explained, the circumstances in this case did not permit the court to replace that juror with an alternate. We first address the propriety of discharging the juror.

*Rule* 1:8–2(d)(1) governs the removal and substitution of jurors in civil and criminal trials, both before and after the commencement of deliberations. Under the Rule, a juror may be discharged for "good cause" before deliberations begin. Until that point, the panel ordinarily exceeds twelve jurors, and the removal of a juror reduces by one the number of alternates to be chosen at the end of the case. However, once the case has been submitted to the twelve jurors chosen to decide guilt or innocence, a deliberating

juror may be replaced with an alternate juror only in specifically defined circumstances.

■ *Rule* 1:8–2(d)(1) provides that

[i]f the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or *other inability to continue*, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

[*R.* 1:8–2(d)(1) (emphasis added).]

The Rule delicately balances two important goals: judicial economy and the right to a fair jury trial. *See State v. Phillips,* 322 *N.J.Super.* 429, 436, 731 *A.*2d 101 (App.Div.1999). Declaring a mistrial imposes enormous costs on our judicial system, from the expenditure of precious resources in a retrial to the continued disruption in the lives of witnesses and parties seeking closure. Any court that has presided over days or weeks of testimony must experience a sense of futility at the prospect of aborting a trial in the jury deliberation stage.

*Rule* 1:8–2(d)(1) and our case law delineate the circumstances in which juror substitution will not undermine the sanctity of the jury's deliberative process. Death and illness are distinct conditions personal to a juror. *R.* 1:8–2(d)(1). Having an alternate substitute for a juror who has died or is ill does not pose a threat to the integrity or independence of the deliberative process. On the other hand, the "inability to continue" standard is necessarily vague because it is impossible to catalogue the myriad circumstances personal to a deliberating juror that may warrant her removal and substitution.

We have restrictively interpreted the phrase "inability to continue" in *Rule* 1:8–2(d)(1) to protect a defendant's right to a fair jury trial, forbidding juror substitution when a deliberating juror's removal is in any way related to the deliberative process. *See State v. Williams,* 171 *N.J.* 151, 163, 793 *A.*2d 594 (2002). A deliberating juror may not be discharged and replaced with an

alternate unless the record " 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.' " *State v. Hightower*, 146 *N.J.* 239, 254, 680 *A.*2d 649 (1996) (quoting *State v. Valenzuela*, 136 *N.J.* 458, 472–73, 643 *A.*2d 582 (1994)). A juror cannot be removed merely because she is taking a position at odds with other jurors' views. *State v. Paige*, 256 *N.J.Super.* 362, 380–81, 607 *A.*2d 164 (App.Div.), *certif. denied*, 130 *N.J.* 17, 611 *A.*2d 655 (1992). A juror has the unassailable right to see the evidence in her own way and to reach her own conclusions, regardless of how overwhelming the evidence or how illogical her view may appear to other jurors. " 'If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations.' " *Hightower, supra*, 146 *N.J.* at 254, 680 *A.*2d 649 (quoting *Valenzuela, supra*, 136 *N.J.* at 472–73, 643 *A.*2d 582).

Courts have sanctioned the removal and replacement of deliberating jurors under the "inability to continue" standard in a variety of different circumstances. *See, e.g., Williams, supra*, 171 *N.J.* at 167, 171, 793 *A.*2d 594 (permitting removal and replacement of deliberating juror who complained of financial hardship); *State v. Miller*, 76 *N.J.* 392, 401, 406–07, 388 *A.*2d 218 (1978) (upholding removal of deliberating juror who asked to be dismissed because his nervous and emotional condition was "affecting his judgment" and "he did not think he could render a fair verdict"); *State v. Holloway*, 288 *N.J.Super.* 390, 404, 672 *A.*2d 734 (App.Div.1996) (affirming removal of deliberating juror whose "conversation with a relative patently influenced [her]" and who, as such, "disregarded the court's unambiguous admonitions"); *State v. Trent*, 157 *N.J.Super.* 231, 235, 240, 384 *A.*2d 888 (App.Div.1978) (allowing removal of deliberating juror who was "nervous," "too emotional," and suffering from "headache" and nausea because defendant reminded her of her son), *rev'd on other grounds*, 79 *N.J.* 251, 398 *A.*2d 1271 (1979).

Nevertheless, we have cautioned judges that after deliberations have begun, juror substitution "should be invoked only as a last resort." *Hightower, supra,* 146 *N.J.* at 254, 680 *A.*2d 649; *see also Valenzuela, supra,* 136 *N.J.* at 468, 643 *A.*2d 582. We offered that admonition because "juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process...." *Hightower, supra,* 146 *N.J.* at 254, 680 *A.*2d 649. Inasmuch as the essence of jury deliberations is a collective sharing of views, reconstituting a jury in the midst of deliberations "can destroy the mutuality of those deliberations." *Williams, supra,* 171 *N.J.* at 163, 793 *A.*2d 594 (citing *State v. Corsaro,* 107 *N.J.* 339, 349, 526 *A.*2d 1046 (1987)).

To illustrate the difference between proper and improper juror discharge, we compare two cases. In a factual scenario remarkably similar to the present one, the Appellate Division in *Trent, supra,* affirmed the substitution of a juror with an exclusively personal condition that impeded her ability to continue as a deliberating juror. 157 *N.J.Super.* at 240, 384 *A.*2d 888. In *Trent, supra,* after six hours of deliberations, a juror sent out a note that she was " 'getting sick.' " *Id.* at 235, 384 *A.*2d 888. In an exchange with the court, the juror stated, " 'every time I see [the defendant] sitting there I can picture my son sitting there.' " *Id.* at 236, 384 *A.*2d 888. The juror explained that she had a " 'headache,' " " 'want[ed] to spit up,' " and " 'just [felt] too emotional.' " *Id.* at 235, 384 *A.*2d 888. The Appellate Division upheld the trial court's removal and substitution of the troubled juror on the ground that the juror was "unable to continue" under *Rule* 1:8–2(d)(1). *Id.* at 240, 384 *A.*2d 888. The appellate panel found that the juror's "disabling distress ... engendered by her identification of defendant with her own son" incapacitated her just as if she had been incapacitated by an illness "totally unrelated to the trial." *Ibid.* The panel did not perceive that the juror bias in *Trent, supra,* was of a type that had the capacity to taint or infect the jury. *Ibid.*

On the other hand, *Valenzuela, supra,* presents a case in which juror substitution was inappropriate. 136 *N.J.* at 472, 643 *A.2d* 582. In *Valenzuela, supra,* we concluded that the trial court committed reversible error by discharging a deliberating juror for reasons related to her interaction with other jurors. *Id.* at 472–73, 643 *A.2d* 582. In that case, the trial court received a note from the jury that one of its members did not want to continue as a juror. *Id.* at 462, 643 *A.2d* 582. The court then engaged in a colloquy with the reluctant juror. *Id.* at 462–65, 643 *A.2d* 582. The juror stated that the other jurors were " 'ganging up' " on her and " 'discounting' " her opinion. *Id.* at 462, 464, 643 *A.2d* 582. The juror explained that although her colleagues considered her a hindrance to reaching a " 'final verdict,' " she could follow the court's instructions and apply the evidence to the law. *Id.* at 464, 643 *A.2d* 582. Nevertheless, the court concluded that the juror was "unable to function in the jury room." *Id.* at 470, 643 *A.2d* 582. In rendering its decision, the court referred to one jury note stating that the juror did " 'not understand the process,' " changed her vote " 'every 10 seconds,' " and was " 'very confused' " and " 'not capable of expressing herself.' " *Id.* at 464, 466, 643 *A.2d* 582. The court also found that based on its observations the juror was " 'somewhat, bizarre' " and not of overly " 'acute intelligence.' " *Id.* at 466, 643 *A.2d* 582. We held that the court abused its discretion in discharging the juror because the record strongly suggested that "the juror's problems related not only to personal circumstances but also to factors arising from the juror's interaction with the other jurors. . . ." *Id.* at 473, 643 *A.2d* 582.

In this case, defendant does not claim, and nothing in the record suggests, that juror number nine was discharged because of her interaction with other jurors. The lengthy colloquy makes it abundantly clear that juror number nine decided that she was unable to follow the law. Juror number nine, in a highly emotional state, told the court and counsel that as a "black woman" with children defendant's age she could not "make a decision to put [defendant] in jail." She explained that she could not see "another young black man going to jail for something really stupid." The

juror expressed embarrassment over her unexpected emotional response to defendant's plight, stating that she was so captive to her feelings that she could not obey her sworn oath and follow the court's instructions on the law. Unlike the juror in *Valenzuela, supra,* the juror in this case did not feel pressured by the other members of the jury. To the contrary, she suggested that her view of the evidence was no different from the other jurors'. She admitted, however, that she could not decide the case based on the evidence fairly, impartially, and without sympathy, and that she was prepared to disregard her own findings of fact based on an overpowering bias toward defendant.

A juror who would decide a case based solely on a defendant's race violates her oath. A juror who would decide a case based solely on a personal identification or revulsion with a defendant, without regard to the evidence, also violates her oath. A juror, as in this case, who announces that she cannot obey her oath, follow the law, and render fair and impartial justice cannot remain on the jury. To rule otherwise would be to yield to a notion that is anathema to our scheme of justice—that a juror, judging the fate of a defendant, can be a law unto herself.

■ We hold that a juror who expressly states that she cannot be impartial or that she is controlled by an irrepressible bias, and therefore will not be controlled by the law, is unable to continue as a juror for purposes of *Rule* 1:8–2(d)(1), and must be removed from a jury. No juror has the right to disregard a court's instructions, that is, to engage in nullification. We know that in the secrecy of the jury room, jurors have the power to nullify the law by acquitting a defendant despite overwhelming evidence of guilt. We acknowledge that reality, not because we approve of such a practice, but because it is beyond our control. As Chief Justice Wilentz stated in *State v. Ragland,*

> [t]he power of the jury to acquit despite not only overwhelming proof of guilt but despite the jury's belief, beyond a reasonable doubt, in guilt, is not one of the precious attributes of the right to trial by jury. It is nothing more than a power. By virtue of the finality of a verdict of acquittal, the jury simply has the *power* to nullify the law by acquitting those believed by the jury to be guilty. We believe

that the exercise of that power, while unavoidable, is undesirable and that judicial attempts to strengthen the power of nullification are not only contrary to settled practice in this state, but unwise both as a matter of governmental policy and as a matter of sound administration of criminal justice.

[105 *N.J.* 189, 204–05, 519 *A.*2d 1361 (1986).]

*See also State v. Banko,* 182 *N.J.* 44, 54, 861 *A.*2d 110 (2004).

Public confidence in our jury trial system requires that verdicts be "based upon an honest consideration of the evidence and not upon prejudice or sympathy." *Panko v. Flintkote Co.,* 7 *N.J.* 55, 62, 80 *A.*2d 302 (1951); *see also State v. Levitt,* 36 *N.J.* 266, 270, 176 *A.*2d 465 (1961) (" 'The parties to the action are entitled to have each of the jurors who hears the case impartial, unprejudiced and free from improper influences.' " (quoting *Wright v. Bernstein,* 23 *N.J.* 284, 294–295, 129 *A.*2d 19 (1957))). When a juror, either before or after the commencement of deliberations, comes before a court and states that she will not abide by her oath and the law, that court is not powerless to act. In such a case, the court must remove the juror and determine whether the circumstances permit substitution with an alternate.

In support of our conclusion, we note that other jurisdictions have recognized the inappropriateness of allowing a juror to deliberate when she has announced her unwillingness to follow the law. *See, e.g., People v. Williams,* 25 *Cal.*4th 441, 106 *Cal.Rptr.*2d 295, 21 *P.*3d 1209, 1213 (2001) (holding that trial court did not abuse discretion by removing juror from deliberations who "felt duty-bound to object" to charge of statutory rape and who stated that he would not follow his oath); *McKenna v. State,* 96 *Nev.* 811, 618 *P.*2d 348, 349 (1980) (holding that "juror who will not weigh and consider all the facts and circumstances shown by the evidence for the purpose of doing equal and exact justice ... should not be allowed to decide the case"). In addition, the United States Supreme Court has long held that "in the courts of the United States it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence." *Sparf v. United States,* 156 *U.S.* 51, 102, 15 *S.Ct.* 273, 293, 39 *L.Ed.* 343, 361 (1895). The *Sparf* Court conclud-

ed that, "[u]nder any other system, the courts, although established in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumentalities devised for the protection equally of society and of individuals in their essential rights." *Id.* at 102–03, 15 *S.Ct.* at 293, 39 *L.Ed.* at 361.

We reject the Appellate Division's view in this case that, absent a physical illness, juror number nine should not have been dismissed under the inability to continue standard. Illness is but one reason for removal and substitution of a juror under *Rule* 1:8–2(d)(1). To construe the words "other inability to continue" to require a physical ailment or disability would render those words superfluous to the Rule. We adopt a broader interpretation with sensible limits. We conclude that juror number nine's expressed refusal to abide by her sworn oath to follow the law due to her emotional identification with defendant rendered her "unable to continue" serving as a juror.

## III.

Our determination that the reasons for the removal of juror number nine were personal to her and not driven by the deliberative process does not resolve the question of whether it was appropriate to reconstitute the jury with an alternate juror. There remains the issue of whether juror number nine's bias irremediably infected the jury. As noted earlier, juror number nine's bias in favor of defendant was cast, in part, in a racial light. A juror suffering from a purely personal problem, like a physical illness, could be removed and replaced by an alternate without fear that the ultimate verdict's validity has been compromised. *R.* 1:8–2(d)(1). Juror bias that is injected into the jury room, however, is not resolved simply by dismissing and replacing the juror who introduced the bias. *See Trent, supra,* 157 *N.J.Super.* at 239, 384 *A.2d* 888. Before a court reconstitutes a jury based on the discharge of a deliberating juror who admits to a disabling bias, the court must satisfy itself that the deliberative process has not

been poisoned. *See generally Panko, supra,* 7 *N.J.* at 61–62, 80 *A.*2d 302 (noting that "the test for determining whether a new trial will be granted because [of juror misconduct] or the intrusion of irregular influences is whether such matters *could have a tendency* to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs") (emphasis added).

The removal of a juror for bias during deliberations ordinarily will call for a mistrial, not reconstituting the jury with an alternate. *See Hightower, supra,* 146 *N.J.* at 254, 680 *A.*2d 649 (quoting *Trent, supra,* 157 *N.J.Super.* at 239, 384 *A.*2d 888). Here, the trial court did not determine whether the discharged juror injected racial considerations into the jury's deliberations. Arguably, defendant stood to benefit from a personal racial appeal by juror number nine to her fellow jurors on his behalf. Defendant contends, however, that the jurors might have reacted negatively to any argument premised on race. We glean from the colloquy between the court and juror number nine that the remaining jurors were prepared to convict defendant and, therefore, were not swayed by any impermissible appeal to nullify the law.

Additionally, shortly after the court chose to substitute juror nine, the reconstituted jury convicted defendant. We need not decide whether any possible inappropriate remarks by juror number nine in the jury room somehow backfired to the detriment of defendant because we now conclude that the jury deliberations had advanced to the point that substitution with an alternate juror was not an acceptable option.

## IV.

We have recognized that, despite the benefits of judicial economy allowed by the substitution procedure of *Rule* 1:8–2(d)(1), there are times when jury deliberations have proceeded too far to permit replacement of a deliberating juror with an alternate. *See Hightower, supra,* 146 *N.J.* at 262–63, 680 *A.*2d 649; *Miller, supra,* 76 *N.J.* at 407, 388 *A.*2d 218. In *Corsaro, supra,* we

observed that "[t]he reconstitution of the jury by the substitution of a new juror in the course of the jury's deliberations can destroy the mutuality of the jury's deliberations," and "impose precisely the kind of extraneous influence upon the deliberative process that this Court has forbidden." 107 *N.J.* at 349, 351, 526 *A.*2d 1046. "[W]here the deliberative process has progressed for such a length of time or to such a degree that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence," there is a concern that the new juror will not play a meaningful role in deliberations. *Id.* at 352, 526 *A.*2d 1046. In such cases, the replacement juror is likely to be confronted with "closed or closing minds." *Ibid.*

As a general rule, "[t]he longer the period of time the jury deliberates, the greater is the possibility of prejudice should a juror be substituted or replaced." *Miller, supra,* 76 *N.J.* at 407, 388 *A.*2d 218. However, "[t]he concern in determining whether substitution can take place at a given point in the deliberations is not merely the length of time that the jury has deliberated but the effect that the progress in deliberations will have on the reconstituted jury's ability truly to begin deliberations anew." *Valenzuela, supra,* 136 *N.J.* at 474–75, 643 *A.*2d 582.

In *Corsaro, supra,* juror substitution occurred after a partial verdict was rendered. 107 *N.J.* at 344–45, 526 *A.*2d 1046. We found that in such a situation the likelihood that deliberations would begin anew was so remote that a mistrial was necessary. *Id.* at 354, 526 *A.*2d 1046. Similarly, in this case, the lengthy court colloquy with juror number nine strongly suggests that eleven jurors already had made up their minds to convict defendant. Juror number nine's comments that she could not agree with what the other jurors "want[ed]," and that "if everybody else wants to send him to jail, let them do it, but I can't be responsible for that," clearly signaled the jury count.[1] Moreover, juror number nine

---

[1] Defense counsel at sidebar, out of the presence of juror number nine, stated, "[i]t would appear to me, it looks like it may be eleven to one at this point." He

indicated that but for her holdout position, the case would have been resolved. Her comments suggest that the other jurors had reached a decision and were prepared to convict defendant at the moment of substitution.

In such circumstances, it is unlikely that a new juror would have "a realistic opportunity to understand and share completely in the deliberations that brought the other jurors" to their viewpoints, or to participate in an open-minded dialogue without a preordained result. *Id.* at 352, 526 *A.*2d 1046. By the time of the alternate juror's entrance, the die appears to have been cast. There was little prospect that the original jurors would have been capable of honoring an instruction to begin deliberations anew or that the alternate would not have felt pressured to fall in line with the already committed eleven jurors. That the newly reconstituted jury returned a verdict in twenty-three minutes lends credence to the argument that minds were closed when the alternate joined the deliberations. In this posture, judicial economy had to bow to defendant's fair trial rights and a mistrial should have been declared.[2]

---

also commented, "I think she is just feeling pressure from the other eleven because they voted one way and she voted another way."

[2] We disapprove of that part of the holding in *State v. Holloway* that allowed a substitute juror to join a jury that had announced its verdict to convict. 288 *N.J.Super.* 390, 405, 672 *A.*2d 734 (App.Div.1996). In *Holloway, supra,* at the time the jury was polled to announce its "unanimous" verdict, one juror expressed disagreement with the verdict. *Id.* at 397, 672 *A.*2d 734. The jury then was sent back to continue deliberating. *Ibid.* Later, the recalcitrant juror was removed after she admitted to having a conversation with a relative that might have influenced her vote. *Id.* at 397–98, 401, 672 *A.*2d 734. The court then chose a replacement juror and directed the newly reconstituted jury to begin deliberations anew. *Id.* at 402, 672 *A.*2d 734. A guilty verdict followed. *Ibid.* The Appellate Division panel held that "the timing of the juror substitution here did not require the trial court to grant a mistrial." *Id.* at 405, 672 *A.*2d 734. We cannot square that holding with our decision in *Corsaro, supra,* or in this case. The fear we expressed in *Corsaro, supra,* of an alternate juror facing closed minds was surely presented in *Holloway, supra.* Our holding today would require a mistrial under facts similar to those in *Holloway, supra.*

## V.

### A.

We also offer the following observations regarding the colloquy between the court and juror number nine. The trial court was presented with a difficult situation and assiduously tried to examine a juror in emotional turmoil to determine whether she could continue to serve. We understand that the court had to learn the source of the juror's problem. We are convinced that the court was acting in good faith and earnestly trying to ascertain whether or not juror number nine satisfied the requirements for dismissal in *Rule* 1:8–2. Nevertheless, during the court's well-meaning inquiry, juror number nine revealed the positions held by her fellow jurors, as well as her own, on the issue of defendant's guilt. It became apparent from the dialogue that the other jurors intended to convict defendant.

We cannot overemphasize the importance of maintaining the secrecy of jury deliberations for the purpose of encouraging free and vigorous discourse in the jury room. *See State v. Young,* 181 *N.J.Super.* 463, 468, 438 *A.*2d 344 (App.Div.1981) (recognizing that there are "strong policy reasons which shield the deliberative process of juries"), *certif. denied,* 91 *N.J.* 222, 450 *A.*2d 549 (1982). The premature revelation of jurors' voting inclinations could damage the deliberative process and improperly influence the decisions that must be made by both counsel and the court. A careful inquiry by a court may forestall the inadvertent disclosure of confidential information by a juror. Judges must caution a juror at the outset of the colloquy that she must not reveal the way in which any juror plans to vote, or the vote tally on a verdict. Providing that safeguard minimizes the risk that the judge will obtain information that will give rise to a claim of impropriety. *See, e.g., Hightower, supra,* 146 *N.J.* at 249, 680 *A.*2d 649 (noting that before beginning inquiry to determine whether juror substitution was appropriate, court warned jurors not to reveal their positions); *Valenzuela, supra,* 136 *N.J.* at 462, 643 *A.*2d 582 (quoting trial court's cautionary words before questioning of trou-

bled juror: "I don't want to hear from you what they are saying in there. I don't want to know from you what your position is on the case. My question of you is, are you willing to sit and discuss the case with them?"); *State v. Singleton,* 290 *N.J.Super.* 336, 345, 675 *A.*2d 1143 (App.Div.1996) (observing that court, during colloquy with juror, stated, "I don't want you to tell me what you're thinking or what the other jurors are thinking").

### B.

Finally, defendant argues that the court inadequately instructed the newly reconstituted jury before it began deliberations anew. In accordance with the Model Criminal Charge,[3] the court instructed the jurors that, "[they] must set aside and disregard all past deliberations and begin [their] deliberations anew, just as if [they] were now entering the jury deliberating room for the first time." Defendant contends, however, that the court should have directed the jury not to speculate about the reasons for juror nine's dismissal. Defendant expresses concern that some jurors might interpret a juror's discharge in such circumstances as a sign that the court disapproved of jurors who would vote not guilty.

We find that the court did not err by instructing the jury consistent with the Model Criminal Charge. That does not mean, however, that the model charge cannot be improved. The Model

---

[3] The Model Criminal Charge reads as follows:

As you know, Juror # ____ has been excused from the jury. An alternate juror has been selected to take (his/her) place. Because of this change in your jury, you must set aside and disregard all of your past deliberations and begin your deliberations again, just as if you were now entering the jury room for the first time directly after listening to my charge. In beginning your deliberations again, you must eliminate any impact that Juror # ____ may have had on your deliberations, and consider the evidence in the context of full and complete deliberations with the new member of your jury.

[*Model Jury Charges (Criminal),* Alternate Juror Empaneled After Deliberations Have Begun (1979).]

Civil Charge addressing the same subject uses different language that more clearly expresses why it is important to begin deliberations anew.[4] We do not know that there is any good reason to give different charges to similarly situated civil and criminal juries when an alternate juror is empaneled in the deliberation stage of a trial.

We note, as well, that the Supreme Judicial Court of Massachusetts requires a judge to give instructions in addition to those in our model charge before sending a reconstituted jury back to deliberate. *Commonwealth v. Connor*, 392 *Mass.* 838, 467 *N.E.*2d 1340, 1346–47 (1984). Those instructions are that "the jury should be instructed not only to begin deliberations anew ... *but also that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or [her] relationship with [her] fellow jurors." Ibid.* (emphasis added) (citation omitted). We believe that there may be merit to giving such an instruction in circumstances similar to those in this case.

Accordingly, we recommend that the Committee on Model Criminal Charges review the language of the Model Civil Charge

---

[4] The Model Civil Jury Charge reads:

As you know, Juror # ____ has been excused from the jury. An alternate juror has been appointed to take his/her place. As of this moment, as a new jury, you are to start your deliberations over again.

The parties have the right to a verdict reached by six jurors who have had full opportunity to participate in deliberations from start to finish. The alternate juror is now entering the jury room with no knowledge of any deliberations that may already have taken place. The remaining jurors and the alternate juror must begin at the very beginning of the deliberation process. You remaining jurors must disregard whatever may have occurred and anything which may have been said in the jury room since you entered that room after listening to my charge. You are to give no weight to any opinion which Juror # ____ may have previously expressed in the jury room before he/she was excused. Together, as a new jury, you shall consider the evidence all over again as you conduct full and complete deliberations, until you have reached your verdict.

[*Model Jury Charges (Civil)*, Alternate Juror Empaneled After Deliberations Have Begun (1993).]

and the quoted portion of the Massachusetts charge to determine whether the current Model Criminal Charge should be amended.

## VI.

To summarize, a deliberating juror who expressly states that she will not obey her oath and follow the law, as instructed by the court, is unable to continue serving as a juror and may be substituted with an alternate juror under *Rule* 1:8–2(d)(1). In this case, the replacement of juror number nine with an alternate juror occurred after the jury's deliberations had proceeded so far towards an ultimate conclusion that it was no longer realistic to expect that open-minded deliberations could begin anew. For the reasons explained in this opinion, we affirm the Appellate Division's reversal of defendant's convictions and order a new trial.

*For affirmance and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.