928 A.2d 842 (2007)
395 N.J. Super. 205
STATE of New Jersey, Plaintiff-Respondent,
v.
Alex BANKS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 2007.
Decided July 26, 2007.
*844 Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
James F. Smith, Assistant County Prosecutor, argued the cause for respondent (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney; Mr. Smith, of counsel and on the brief).
Before Judges SKILLMAN,[1] LISA and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Alex Banks appeals from a final judgment of conviction and sentence. The verdict was returned by a jury that was reconstituted after the original panel advised the court that it could not reach a unanimous verdict. Replacement of a problem juror with an alternate over defendant's objection and request for a mistrial "was not a permissible option because the jury's deliberations had proceeded so far towards completion that a reconstituted jury would not have been capable of considering defendant's guilt or innocence anew. . . ." State v. Jenkins, 182 N.J. 112, 116, 861 A.2d 827 (2004). Accordingly, we reverse.
The reconstituted jury found defendant guilty of third-degree possession of heroin, a controlled dangerous substance, N.J.S.A. 2C:35-10a(1) (count one); third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(3) (count two); second-degree possession of heroin with intent to distribute in a public housing zone, N.J.S.A. 2C:35-7.1 (count three); two counts of third-degree distribution of heroin, N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(3) (counts four and six), and two counts of second-degree distribution of heroin in a public housing zone, N.J.S.A. 2C:35-7.1 (counts five and seven). The trial court found defendant guilty of the disorderly persons offense of possession of fifty grams or less of marijuana, N.J.S.A. 2C:35-10a(4).
The court denied defendant's motion for a new trial and, based on defendant's prior conviction for distribution of a controlled dangerous substance, granted the State's motion to impose a mandatory extended term pursuant to N.J.S.A. 2C:43-6f. The court merged counts one, two and three of the indictment into count four and count six into count seven. Defendant was sentenced to an aggregate term of ten years, five years to be served without possibility of parole. The court also required defendant to provide a DNA sample, revoked his driving privileges and imposed DEDR penalties, lab fees, VCCB assessments and a LEOTEF penalty.[2]
*845 The following evidence was presented at trial. At noon on March 8, 2002, Sergeant Samuel Dickson of the Atlantic City Police Department conducted a surveillance of a public housing facility, which was an area known for illegal drug trade. He positioned himself in a nearby high-rise building and used high-powered binoculars to view the courtyard of the complex. Officers Hersch, Dungan and O'Hala were available to make an arrest at his direction.
Dickson noticed six or seven people, including defendant, gathered in the courtyard. While Dickson watched, Christopher Fedor approached the group and spoke with defendant. Defendant and Fedor walked away from the others and into a breezeway. Dickson saw an exchange. He contacted Officer Hersch and directed him to arrest Fedor. As Hersch approached Fedor, he saw him throw two small objects onto the ground. Hersch retrieved two glassine bags that were stamped "White House" and held heroin.
Dickson stayed at his post. He saw Pete Gonzalez enter the courtyard. Defendant directed Gonzalez to the breezeway and followed him. Gonzalez took money from his pocket. Although Dickson did not see a transaction, he saw defendant and Gonzalez standing together face to face. Dickson directed Officer Dungan to arrest Gonzalez. As Dungan approached, Gonzalez discarded two baggies that were stamped "White House" and contained heroin.
Dickson then reached Officer O'Hala, who arrested defendant and searched him. O'Hala found a bag of marijuana and cash in the amount of $281. Although O'Hala did not find any heroin at that time, he later found a "small glassine packet," stamped "White House," in the rear seat of the patrol car he used to drive defendant to the police station.
Jury deliberations commenced at 11:30 a.m. on October 5, 2005. The jurors were given a one-hour break for lunch at 12:30 p.m. Shortly after deliberations resumed, the jurors requested and received additional instruction on the legal definitions of possession and constructive possession and asked whether the State was required to establish defendant's possession of all five bags of heroin to return a verdict of guilty on count one.
The jurors were given additional instruction and resumed deliberations at 2:43 p.m. Shortly after 3:00 p.m., they sent the court a note advising that they could not reach a "unanimous agreement/verdict." At 3:43 p.m., the court gave the jurors entirely proper instructions on continuing deliberations and asked them to continue their efforts.
After resuming deliberations, the jury sought additional guidance: "What do we do in the case where one of the jurors may hold personal bias towards the police or victims due to prior circumstances? This was previously discussed at sidebar." The jurors returned to the courtroom at 4:38 p.m. The court excused them for the day at 4:40 p.m., with an admonition to refrain from any discussion of the case until deliberations resumed.
The next morning the court suspended deliberations and interviewed the jurors individually. The interviews were done on the record and in the presence of the prosecutor, defendant and defense counsel.
The foreperson identified the problem juror referenced in the note, who was juror number twelve. She explained that all of the jurors, including juror number twelve, agreed to bring the matter to the court's attention. In her words: he "pretty *846 much explained to us that his own personal experiences are getting to the judgment of this case, they're coming into play"; "he's pretty much come out and said that, you know, his previous experiences, dealing with friends of his or, you know, police in general is getting in the way." The foreperson assured the court that juror number twelve suggested that he discussed his experiences at sidebar but had not repeated what he said.
The record reflects that juror number twelve had come to sidebar twice during the selection process. He disclosed that he had friends who were police officers in Pleasantville and that he had been convicted in municipal court after failing to comply with a police officer's direction to stop his car. The record does not reflect that he indicated that his experiences would prevent him from deciding the case based on the evidence and law.
The court interviewed juror number twelve, who acknowledged that he knew about the jury's note and did not object. When the court explained that the foreperson thought he held "personal bias towards the police or victims," he said "[t]hat's not so." The juror explained that he was "voicing [his] opinion because [of] what we seen and what we get." He said he could not "change [his] mind because [he] kn[ew] what [he] heard here." He acknowledged that jurors, including himself, were "talking about experiences they've had with the police." The court asked if "as a result of [his] experiences and based on that alone, [he was] taking a certain position as to whether the police should be believed in this case." Juror number twelve said, "No, not that." Referring to the police officers, he explained "I didn't understand somebody with such experience[,] . . . the papers that we have out there, the documents, they weren't correct and when you've been in that field so long, I didn't understand that part." When asked whether he was saying that his view of the case was based on the evidence presented at trial, the problem juror said "Yes, sir." He confirmed that his view was not based on his experience and that he was not biased because of his prior arrest. He said he could listen to the views of his fellow jurors without calling on his own experience with the police. Consistent with the foreperson's account, he said he had not repeated what he said at sidebar. He said other jurors asked why he went to sidebar.
The court questioned the remaining jurors. The members of the panel reported that juror number twelve had disclosed the following: he had friends who were police officers who did not always go by the book; he said the police are "not always right"; his views about police corruption were "extreme"; he talked about a prisoner who killed himself because of abuse inflicted on him by fellow prisoners.
The jurors offered the following explanations of the problem: juror number twelve could not believe anything a police officer would say and "can't trust the police"; he was "unable to focus on what he needs to" because of his "experiences through his life"; he said he should not be on the jury; he would have a problem coming to a fair decision in any case involving police; he was biased. One juror described juror number twelve as being able to see one side of things and the other side of things but not able to "firm it out . . . one way or another because of" his experiences. According to another juror, juror number twelve was confused himself about whether his views of the case were based on the evidence or his personal experiences. Another juror described juror number twelve as having a "preconceived notion that police would be a certain way" and difficulty in understanding the significance of circumstantial evidence.
*847 All of the jurors assured the court that the juror's remarks during their prior deliberations would not prevent them from deciding the case fairly on the evidence. All, except the foreperson, who was not asked, stated they would be able to begin deliberations anew and as if no prior deliberations had taken place if an alternate juror were appointed. One juror, who described himself as firm in his vote, said he was able to start over again. Another assured the court that he "would be totally open to any new point of view [he had not] considered."
The court found that juror number twelve had not been candid during voir dire and held a bias relevant to his assessment of the credibility and conduct of police officers that was getting in the way of his considering the evidence in the case. The court concluded that the problem juror's inability to function was personal and unrelated to his interaction with the other members of the jury.
The court discharged the juror, and defendant moved for a mistrial. The court determined that a mistrial was unnecessary because each of the remaining jurors was willing to begin deliberations anew and the alternate jurors were not aware of or tainted by the dismissal of the problem juror. The alternates, who were in the courtroom when the jury's note announcing its inability to reach a unanimous verdict was read into the record, were aware that the court excused one of the deliberating jurors.
An alternate was selected. The court directed the newly constituted jury to "wipe the slate clean" and begin deliberations anew. The jurors commenced deliberations at 1:50 p.m. and returned a unanimous verdict at 3:05 p.m.
Defendant raises the following issues on appeal:
I. THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO TRIAL BY JURY BY IMPROPERLY SUBSTITUTING A JUROR RATHER THAN DECLARING A MISTRIAL. U.S. CONST., AMENDS. VI, XIV; N.J. CONST. (1947) ART. 1, PARS. 9, 10.
II. THE STATE COMMITTED MISCONDUCT IN CREATING DEMONSTRATIVE EVIDENCE DURING SUMMATION, AND WHETHER THE TRIAL COURT COMPOUNDED THE ERROR BY EFFECTIVELY ENDORSING THE STATE'S IMPROPER ACTION. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. 1, PARS. 9, 10.
III. DEFENDANT WAS PREJUDICED BY THE TRIAL COURT'S ONE-SIDED AND ACCUSATORY CHARGE AS TO CIRCUMSTANTIAL EVIDENCE. (Not Raised Below)
IV. THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE. ADDITIONALLY, A NATALE REMAND IS REQUIRED.
As noted above, the argument raised in Point I has merit. It was improper to submit this case to a reconstituted jury.
A trial court has discretion to remove and replace a deliberating juror "because of [the juror's] illness or other inability to continue." R. 1:8-2(d)(1). Substitution of an alternate for a deliberating juror involves two distinct inquires. See Jenkins, supra, 182 N.J. at 125, 861 A.2d 827. The first question is whether there are grounds for removal of the deliberating juror. Ibid. The second is whether substitution of an alternate or grant of a mistrial is required. Id. at 125, 130-33, 861 A.2d 827.
*848 The "inability to function [that warrants removal of a deliberating juror must be] personal and unrelated to the juror's interaction with the other jury members." Id. at 125, 861 A.2d 827 (internal quotations and citations omitted). The term "inability" is interpreted restrictively in order to protect a "defendant's right to a fair jury trial." Id. at 124, 861 A.2d 827. Thus, a juror may not be removed for reasons related to the "deliberative process" but must be removed when the juror has declared an inability to follow the law due to bias, prejudice or sympathy. Id. at 124, 129, 861 A.2d 827.
Even when removal of a deliberating juror is required, substitution of an alternate juror is not always a "permissible option." Id. at 124, 861 A.2d 827. The Rule authorizing substitution "is to be employed sparingly." State v. Valenzuela, 136 N.J. 458, 468, 643 A.2d 582 (1994). Assuming removal of a sitting juror is warranted, there are two concerns raised by substitution of a juror during deliberations that must be considered in determining whether to reconstitute the jury or grant a mistrial.
The first question relevant to the choice between mistrial and substitution of an alternate juror is whether the cause for removal, by its nature, was likely to influence the jurors who were members of the initial panel to arrive at a verdict not based on the law and evidence. For example, when a deliberating juror is removed because of bias, rather than physical illness, the court must consider whether that "bias irremediably infected the jury." Jenkins, supra, 182 N.J. at 130-31, 861 A.2d 827 (discussing the possibility that a juror's expression of racial bias favoring defendant could somehow backfire to the defendant's detriment after removal of the biased juror). "The removal of a juror for bias during deliberations ordinarily will call for a mistrial, not reconstituting the jury with an alternate." Id. at 131, 861 A.2d 827.
The second question is whether, regardless of the grounds for removal, "the jury's deliberations ha[ve] proceeded so far towards completion that a reconstituted jury would not [be] capable of considering [the] defendant's guilt or innocence anew." Id. at 116, 861 A.2d 827. Whenever a deliberating juror is replaced, there is a potential for interference with the mutual and collective nature of jury deliberations that is critical to the jury process. Id. at 132, 861 A.2d 827; State v. Corsaro, 107 N.J. 339, 349, 526 A.2d 1046 (1987). The potential for diminishing the mutuality and collectivity of deliberations increases as deliberations progress to resolve factual issues relevant to guilt or innocence; duration of deliberations is relevant but not determinative. Jenkins, supra, 182 N.J. at 132, 861 A.2d 827 (noting that the question is not as much a matter of time spent as progress made). When an alternate juror becomes a member of a reconstituted jury after the other members of the panel have made factual findings or reached determinations about guilt or innocence, it is unrealistic to conclude that the new member likely will have a meaningful opportunity to participate in the collective and mutual consideration of the evidence with the others members. Id. at 131-32, 861 A.2d 827; Corsaro, supra, 107 N.J. at 352-53, 526 A.2d 1046.
Our courts have relied on clear expressions of the jury's progress toward resolution of facts in concluding that deliberations have progressed too far to permit substitution. Thus, where a jury has rendered a partial verdict or it is otherwise apparent that eleven of the jurors "have made up their minds," the Court has held that it is unlikely that a new juror joining as a member of a reconstituted panel will have a "realistic opportunity . . . to participate in an open-minded dialogue without a *849 preordained result." Jenkins, supra, 182 N.J. at 133, 861 A.2d 827 (court's colloquy with juror suggested that the biased juror was alone in her view); see Corsaro, supra, 107 N.J. at 340-41, 526 A.2d 1046 (partial verdict); State v. Harvey, 318 N.J.Super. 167, 173-75, 723 A.2d 107 (App. Div.1999) (disqualified juror removed after jury reported a deadlock). When "the die appears to have been cast," there is "little prospect" that the remaining jurors will be able to begin anew and the new member will not feel pressure to "fall in line." Jenkins, supra, 182 N.J. at 133, 861 A.2d 827; see Corsaro, supra, 107 N.J. at 352-53, 526 A.2d 1046. Under such circumstance, interests in judicial economy served by Rule 1:8-2(d)(1) must "bow to defendant's fair trial rights," which require mistrial. Jenkins, supra, 182 N.J. at 133, 861 A.2d 827.
The decisions illustrate the focus. In Jenkins the questioning of a juror whose ability to proceed was at issue "strongly suggested" that the other eleven jurors had "made up their minds" and, for that reason, mistrial not substitution was required. Id. at 132-33, 861 A.2d 827. In Corsaro the Court held that it was error to substitute a juror after the panel had returned a partial verdict and the reconstituted panel would be required to reconsider the same evidence in order to resolve the remaining charge. 107 N.J. at 352-53, 526 A.2d 1046.
In Jenkins the Court provided guidance beyond its holding. The Court expressly overruled a decision of this court in State v. Holloway, 288 N.J.Super. 390, 405, 672 A.2d 734 (App.Div.1996). 182 N.J. at 133 n. 2, 861 A.2d 827. In Holloway one juror voiced objections to the verdict after it was announced. 288 N.J.Super. at 397, 672 A.2d 734. The jury was directed to continue deliberations. Ibid. Subsequently a juror was removed for misconduct and replaced. Id. at 402, 672 A.2d 734. This court affirmed the substitution. Id. at 405, 672 A.2d 734. In Jenkins the Court concluded that it could not "square" the holding in Holloway with Corsaro or Jenkins because the fear "of an alternate juror facing closed minds was surely presented in Holloway." 182 N.J. at 133 n. 2, 861 A.2d 827.
Based on our understanding of the holdings and the underlying principles enunciated by the Supreme Court in Corsaro and Jenkins, we conclude that jury deliberations have progressed too far to permit substitution of an alternate juror once a deliberating jury has announced its inability to reach a verdict. A report from a jury that it is unable to reach a unanimous verdict indicates that the individual jurors have resolved, but not agreed on the resolution of, the factual issues.
We recognize that a jury's declaration of inability to reach a verdict does not require an immediate grant of a mistrial or preclude the judge from giving a noncoercive instruction requiring additional deliberation. See State v. Czachor, 82 N.J. 392, 403-07, 413 A.2d 593 (1980). Nonetheless, for purposes of determining whether substitution or mistrial is required based upon progress made in deliberations, the jury's declaration indicates that deliberations have progressed to a point where the individual jurors have made determinations about the evidence and facts.
The Court's reasoning in cases addressing substitution provides relevant guidance. In discussing the impact of substituting an alternate for a deliberating jury, the Court has compared the impact of improperly coercive instructions on duty to deliberate given to a deadlocked jury and juror substitution after deliberations have progressed. Corsaro, supra, 107 N.J. at 350-51, 526 A.2d 1046. The difficulty in both cases is the potential for disruption of "the delicate balance of number and unanimity." Id. at 350, 526 A.2d 1046.
*850 We conclude that substitution of a juror after a jury has indicated its inability to reach unanimity is not a proper circumstance for exercise of the court's discretion to substitute a juror in a criminal case pursuant to Rule 1:8-2(d). It is unrealistic to expect that the remaining members of the original panel will be able to begin "anew" or that the alternate selected as a substitute under that circumstance will not feel "pressure to fall in line" with one of the two divided camps. See Jenkins, supra, 182 N.J. at 133, 861 A.2d 827. The alternates are likely aware of the deadlock. As one of the alternates in this case remarked, he knew because he was present when the deadlocked note was read into the record. The alternate selected necessarily knows that the court has removed a member of a deadlocked panel. At that point, juror substitution poses a likely risk to both mutuality of jury deliberations and the delicate balance of number and unanimity. Interests in judicial economy served by juror substitution do not outweigh the risks. Like a coercive instruction given to a deadlocked jury, the substitution of an alternate after announcement of deadlock injects an extraneous influence. See Corsaro, supra, 107 N.J. at 350-51, 526 A.2d 1046.
There is an additional reason to assume that a jury's announcement of deadlock marks a point beyond which substitution of an alternate is improper. As the court's dialogue with the jurors in this case indicates, after pronouncement of deadlock the demands of an inquiry into grounds for removal and progress in deliberations is inherently likely to divulge jury deliberations. Maintenance of the secrecy of jury deliberations, however, is important to "encouraging free and vigorous discourse in the jury room." Jenkins, supra, 182 N.J. at 134-35, 861 A.2d 827 (discussing the trial court's inquiry and emphasizing the importance of maintaining the secrecy of jury deliberations); see Valenzuela, supra, 136 N.J. at 473, 643 A.2d 582 (noting that where there is reason to suspect that a juror's inability is based in part on deliberations, the court should permit deliberations to continue and declare a mistrial if the jurors are unable to agree).
In this case, despite the trial court's careful questions and conscientious and commendable effort to determine whether there were grounds for removal, much about the content and status of deliberations was disclosed. The responses the jurors gave left the court to determine whether juror number twelve's bias, or his view of the evidence informed by his experience, led him to disagree with the others. As one of the jurors noted, juror number twelve himself seemed confused about the basis for his decision.
Where a jury has announced that its members cannot agree and a subsequent question arises about a juror's "inability" to proceed, the trial court should rely on the presumption that the jurors have deliberated in accordance with the initial charge and any additional instruction consistent with Czachor. See State v. Cooper, 151 N.J. 326, 370, 700 A.2d 306 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000). If the jurors cannot reach a verdict thereafter, then mistrial should be granted. See Valenzuela, supra, 136 N.J. at 472-73, 643 A.2d 582 (directing continued deliberation under the circumstance that the court "suspects" that the problems are due to deliberations). That course of action is consistent with sparing exercise of the authority to substitute an alternate for a deliberating juror. It is protective of interests in avoiding disruption of the balance between juror number and unanimity, ensuring the mutuality of jury deliberations and preserving the secrecy of deliberations.
*851 Our conclusion that a grant of a mistrial was required obviates the need to address defendant's objections to the prosecutor's summation, the jury charge on circumstantial evidence and the sentence imposed.
Reversed and remanded for a new trial on the indictment.
NOTES
[1] Judge Skillman did not participate in oral argument. However, the parties consented to his participation in the decision. R. 2:13-2(b).
[2] There is a discrepancy between the fines, penalties and assessments as stated at the time of sentencing and recorded on the final judgment of conviction. Defendant does not appeal from his conviction of the disorderly persons offense, N.J.S.A. 2C:35-10a(4).