# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5462-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RENATO C. MARQUEZ, JR.,

     Defendant-Appellant.

_____

> Argued November 4, 2020 – Decided December 10, 2020
>
> Before Judges Yannotti, Mawla, and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-06-0382.
>
> Joseph A. Fischetti, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Natalie J. Kraner, Designated Counsel, and Joseph A. Fischetti, on the briefs).
>
> Daniel Finkelstein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Daniel Finkelstein, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree aggravated sexual assault and other offenses. M.P., defendant's stepdaughter, was the victim of these offenses.[1] Defendant appeals from the judgment of conviction dated June 1, 2018. For the reasons that follow, we affirm.

I.

A Union County grand jury returned an indictment charging defendant with first-degree aggravated sexual assault upon M.P. when she was at least thirteen but less than sixteen years old and related to the actor, N.J.S.A. 2C:14-2(a)(2)(a) (count one); second-degree sexual assault, upon M.P., when she was at least sixteen but less than eighteen years old and related to the actor, N.J.S.A. 2C:14-2(c)(3)(a) (count two); second-degree sexual assault upon M.P. when she was at least thirteen but less than sixteen years old and at least four years younger than the actor, N.J.S.A. 2C:14-2(c)(4) (count three); and second-degree endangering the welfare of a child, by engaging in sexual conduct that would impair or debauch the morals of a child, N.J.S.A. 2C:24-4(a)(1) (count four).

We briefly summarize the evidence presented at trial. M.P. was born in the Philippines in 1991. When she was six months old, M.P.'s mother E.M.

---

[1] We use initials for certain individuals to protect the identity of the victim of the sexual offenses. See R. 1:38-3(c)(12).

moved to the United States while M.P. remained in the Philippines with her grandparents, aunts, and uncles. In March 2004, M.P. relocated to New Jersey to live with her mother, defendant, and her brother. M.P.'s aunt M.B. moved to Canada and occasionally visited M.P.'s mother and her family in New Jersey.

M.P. testified that she did not have a father figure in her life until she met defendant. She testified that, at some point, her relationship with defendant changed from the normal father/daughter relationship. She stated that at times, when her mother was not present, defendant would touch her vagina with his finger. M.P. said that on one occasion, her mother caught defendant kissing her and her mother became upset.

Thereafter, M.P.'s mother sent her abroad to stay with her grandparents for a few weeks. M.P. was concerned her mother would send her back to live in the Philippines. M.P. said that after her mother saw defendant kissing her, she told her to always keep her bedroom door locked. She testified that defendant continued to try to kiss her and touch her over her clothes.

In September 2004, M.P. turned thirteen years old. She stated that on February 5, 2005, defendant raped her while her mother was not at home. M.P. said defendant told her to lay on the floor of her mother and defendant's

bedroom.  According to M.P., defendant removed her pajamas and underwear, took off his boxer shorts, and penetrated her vaginally with his penis.

M.P. said that after the assault, she was in pain and ran to her room, but defendant followed her and raped her again.  Defendant told her not to tell her mother.  M.P. recalled the date of the assault because defendant would remind her of the date, stating that it was the day he first had a virgin.

M.P. further testified that defendant sexually assaulted her again on the night of her eighth-grade dance while her mother was out of the house.  She said she did not tell anyone because she was afraid her mother would send her back to the Philippines.  M.P. said defendant had sex with her often.  She testified that sometimes, after her mother went to work, defendant would pick the lock on her bedroom door and have sex with her while her brother was in the kitchen eating breakfast.

She said that at times, when defendant drove her to basketball games, he would insert his finger into her vagina.  She tried to resist but became tired of saying no.  She stated that defendant repeatedly had sex with her during the summer after she completed eighth grade and the years she attended high school.

M.P. also testified that the assaults continued after she began to attend college in 2009.  She said her mother occasionally asked her if anything was

"going on," but she was afraid to say anything. She thought her mother would send her back to the Philippines if she found out defendant was having sex with her.

From July 2015 to the end of January 2016, M.B. visited her sister and family in New Jersey. On January 15, 2016, M.B. logged onto defendant's desktop computer and found a video that showed defendant and M.P. engaging in sexual intercourse. The State and defendant stipulated that the video depicted defendant and M.P. engaging in consensual sex, and that M.P. was eighteen years or older when the video was recorded.

That evening, after M.P. came home from work, M.B. asked her "how long has it been going on?" M.P. told M.B. she did not know what she was talking about. M.B. went to the bathroom. When she returned, M.P. cried and told her defendant raped her when she was thirteen. M.P. asked M.B. how she knew, and M.B. said she had seen the video.

Three days later, M.B. told E.M. defendant raped M.P. when she was thirteen years old. M.B. showed E.M. the video of defendant having sex with M.P. M.B. went to the police and provided a statement. M.P. also went to the police and reported that defendant began to assault her sexually when she was thirteen years old. E.M. also provided a statement to law enforcement.

A-5462-17T4

Defendant elected to testify at trial. He admitted having a sexual relationship with M.P. but said it did not begin until 2011, when she was a nineteen-year-old college student. He testified that from 2011 to January 2016, he and M.P. had sexual relations approximately four to six times per month. He denied ever engaging in any sexual activity with M.P. before her eighteenth birthday. He stated that M.P. either fabricated her testimony about what happened before she was eighteen years old, or inadvertently placed the dates of many events much earlier than they actually occurred.

The jury found defendant guilty on all four counts of the indictment. Thereafter, the judge sentenced defendant to an aggregate prison term of twenty-three years, with a parole ineligibility period of eighty-five percent of the sixteen-year sentence on count one, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals from the judgement of conviction and raises the following arguments:

> [POINT I]
> THE TRIAL COURT ERRED BY REFUSING TO GRANT A MISTRIAL WHEN A JUROR DISCLOSED THAT SHE WAS RECEIVING "PRESSURE" FROM OTHER JURORS TO MAKE A DECISION A CERTAIN WAY.

A.    [STANDARD FOR GRANT OF MISTRIAL UPON DISCHARGE OF JUROR AFTER THE COMMENCEMENT OF DELIBERATIONS].

B.    [THE RECORD DEMONSTRATES THAT PRIOR TO JUROR NO. 3'S DISCHARGE, THE JURY HAD FORMED OPINIONS ABOUT THE CASE THAT RENDERED IT UNABLE TO CONDUCT OPEN AND MUTUAL DELIBERATIONS].

[POINT II]
THE TRIAL COURT'S ERRORS BELOW ON EVIDENTIARY ISSUES CONSTITUTED AN ABUSE OF DISCRETION THAT INDIVIDUALLY AND CUMULATIVELY REQUIRE REVERSAL AND A NEW TRIAL

A.    THE TRIAL COURT ERRED BY CLASSIFYING [M.P.'S] STATEMENT TO [M.B.] AS A FRESH COMPLAINT EVEN THOUGH [M.P.] DID NOT OFFER THE STATEMENT WITHIN A REASONABLE TIME OF THE ALLEGED ASSAULT AND DID NOT OFFER THE STATEMENT SPONTANEOUSLY OR VOLUNTARILY.

1.    [A STATEMENT QUALIFIES AS A FRESH COMPLAINT ONLY IF THE COMPLAINANT MAKES THE STATEMENT SPONTANEOUSLY, VOLUNTARILY, AND WITHIN A REASONABLE TIME OF THE ALLEGED ASSAULT].

2.    [M.P. DID NOT MAKE THE STATEMENT WITHIN A REASONABLE TIME AFTER THE ASSAULT, AND IT THEREFORE DOES NOT QUALIFY AS A FRESH COMPLAINT].

3.    [M.P. DID NOT MAKE THE STATEMENT VOLUNTARILY OR SPONTANEOUSLY, AND IT

7

THEREFORE DOES NOT QUALIFY AS A FRESH
COMPLAINT].

B. THE TRIAL COURT ERRED BY
PERMITTING THE STATE TO INTRODUCE TWO
OUT-OF-COURT STATEMENTS OF [E.M.] THAT
WERE NOT INCONSISTENT WITH HER
TESTIMONY AT TRIAL.

C. THE TRIAL COURT ERRED BY APPLYING
THE RAPE SHIELD LAW TO PRECLUDE
[DEFENDANT] FROM PROVIDING A FULL AND
FAIR REBUTTAL TO [M.P.'S] STORY.

D. EVEN IF CONSTRUED AS HARMLESS
ERROR DISCRETELY, THE EVIDENTIARY
ERRORS BELOW REQUIRE REVERSAL WHEN
VIEWED CUMULATIVELY.

[POINT III]
IN THE ALTERNATIVE, THE SENTENCE
IMPOSED WAS MANIFESTLY EXCESSIVE.

A. [THE TRIAL COURT ERRED BY FINDING
THAT JUST ONE MITIGATING FACTOR
APPLIED].

B. [THE TRIAL COURT'S REASONS FOR
IMPOSING CONSECUTIVE SENTENCES LACKED
THE DETAIL REQUIRED UNDER YARBOUGH
AND ARE INTERNALLY INCONSISTENT].

II.

Defendant argues that the trial judge erred by denying his motion for a

mistrial after the judge discharged and replaced a juror during deliberations. He

8

contends that when the jury was reconstituted, it did not have the ability to begin its deliberations anew.

We review a trial court's decision to deny a motion for a mistrial for abuse of discretion. State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). Rule 1:8-2(d)(1) provides in pertinent part that when a trial judge discharges a juror after deliberations have begun and substitutes an alternate juror, "the court shall instruct the jury to recommence deliberations . . . ."

Before doing so, the trial judge must "consider[] whether the jury appears to have progressed to the point where issues have been decided and deliberations cannot commence anew with a substituted juror." State v. Terrell, 452 N.J. Super. 226, 274 (App. Div. 2016) (citing State v. Ross, 218 N.J. 130, 151 (2014)). To determine whether the jury had progressed to such a point, the trial court "must appraise the impact of a juror substitution on the jury process." Ross, 218 N.J. at 147.

If the substitution of a juror would "imperil the integrity of the jury's process[,]" the court must be prepared to declare a mistrial. Ibid. However, "[t]he grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). There is

no "bright line rule" with respect to the length of jury deliberations that would trigger a finding that deliberations are too far along to substitute an alternate juror. Ross, 218 N.J. at 149 (quoting State v. Williams, 171 N.J. 151, 169 (2002)).

To determine whether a reconstituted jury can meaningfully evaluate the evidence, the trial judge should consider certain factors including "the timing of the juror's departure, his or her explanation of the problem prompting the inquiry, and any communications from the jury that may indicate whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations." Ibid. The judge should also consider "whether the original jurors had formed opinions about the case in the absence of the alternate juror . . . ." State v. Williams, 377 N.J. Super. 130, 149 (App. Div. 2005) (quoting People v. Roberts, 214 Ill. 2d 106, 124 (2005)).

Here, the record shows the jury began its deliberations on October 4, 2017, at 1:30 p.m. and continued until 4:40 p.m. These deliberations were interrupted for about twenty minutes for readbacks and playbacks of testimony. On October 5, 2017, at 9:07 a.m., the jury resumed its deliberations, which continued until 10:42 a.m., when the trial judge began to play back certain evidence.

During a lunch break, before the playbacks had been completed, Juror No. 3 approached the judge, outside the presence of the other jurors. She told the judge she did not feel "comfortable" deciding the case. She said she had been under "[a] little bit" of pressure. Defendant moved for a mistrial, arguing that it was too late to substitute a juror. The judge denied the motion. The judge brought Juror No. 3 back into the courtroom and questioned her further.

In response to those questions, Juror No. 3 again stated she did not feel comfortable deciding the case, in part because of what had gone on in the jury room. The juror said she was being pressured to "make a decision in a certain way." She told the judge she had not made a decision and did not think she was capable of doing so. The judge asked the juror if there was anything about the case that affected her personally.

Defendant again moved for a mistrial. The judge decided to question the juror further. The juror said she felt the other jurors were all "mostly for one side." She stated that she had voiced her opinion but she was being "fought back on too much." She said she did not feel comfortable. The judge asked the juror if anyone was putting undue pressure on her. She replied, "[n]o."

The judge decided to explain to the juror that she should try to continue to deliberate. The judge brought the juror back into the court room and asked

11

the juror to continue to serve. The juror began to cry. Upon further questioning, the juror stated that she could not make a fair decision because her father had abused her mentally and physically. She acknowledged that she did not disclose this abuse during jury selection.

Defendant's counsel agreed the juror should be discharged but argued that the court should declare a mistrial because it was too late to replace the juror. Counsel asserted that Juror No. 3 had reported that the other jurors were mostly on one side. The assistant prosecutor opposed the application.

The judge discharged Juror No. 3 and denied defendant's motion for a mistrial. The judge found the deliberations had not progressed to a point where a mistrial was warranted. The judge stated that the jury was still deliberating, noting that the jury had questions about the evidence and was still listening to playbacks of testimony.

The judge also found that Juror No. 3's personal experiences did not taint the other jurors because she did not share those experiences with the other jurors. The judge then replaced Juror No. 3 with an alternate juror and instructed the reconstituted jury to begin deliberations anew. The jury deliberated for approximately four and one-half hours and announced its verdict.

We are convinced the judge did not abuse her discretion by denying defendant's motion for a mistrial. The record supports the judge's conclusion that the deliberations had not progressed to a point where the reconstituted jury could not begin its deliberations anew.

As the judge noted, the jury was still listening to requested playbacks when Juror No. 3 was discharged and replaced by the alternate juror, which indicates the jury was still deliberating when the substitution was made. Moreover, after the jury was reconstituted, it deliberated approximately the same amount of time the jury deliberated before Juror No. 3 was replaced.

Furthermore, the judge instructed the jury it must begin its deliberations over again. The judge told the jury to disregard whatever may have occurred or anything that may have been said in the jury room after the court's initial instructions. The judge did not err by concluding the jury would be able to follow these instructions.

In support of his argument, defendant relies upon State v. Jenkins, 182 N.J. 112 (2004). In that case, a distraught juror advised the court during a break in deliberations that she could not render a fair and impartial verdict. Id. at 115-16. The judge questioned the juror, found she was unable to continue, and replaced her with an alternate juror. Id. at 116.

13

The Court held that the juror's emotional state, which made her incapable of putting aside her bias and passion, was a sufficient basis for the judge to remove her from the jury. Ibid. The Court decided, however, that "replacing the discharged juror with an alternate was not a permissible option because the jury's deliberations had proceeded so far towards completion that a reconstituted jury would not have been capable of considering defendant's guilt or innocence anew . . . ." Ibid.

The Court observed that when the jury's deliberations have "progressed for such a length of time or to such a degree that it is strongly inferable" the jury had made findings of fact or decided on the defendant's guilt or innocence, "there is a concern that the new juror will not play a meaningful role in deliberations." Id. at 132 (quoting State v. Corsaro, 107 N.J. 339, 352 (1987)). The Court stated that "[i]n such cases, the replacement juror is likely to be confronted with 'closed or closing minds.'" Ibid. (quoting Corsaro, 107 N.J. at 352).

The Court stated that, in general, the longer the jury deliberates, "the greater is the possibility of prejudice should a juror be substituted or replaced." Ibid. (quoting State v. Miller, 76 N.J. 392, 407 (1978)). The determination of whether a substitution can take place "is not merely the length of time that the jury has deliberated but the effect that the progress in deliberations will have on

14

the reconstituted jury's ability truly to begin deliberations anew." Ibid. (quoting State v. Valenzuela, 136 N.J. 458, 474-75 (1994)).

In Jenkins, the Court observed that the trial judge's colloquy with the juror "strongly suggests" the other eleven jurors had already decided to find the defendant guilty. Ibid. Indeed, the juror had commented "if everybody else wants to send [the defendant] to jail, let them do it, but I can't be responsible for that . . . ." Ibid.

The facts of this case are significantly different. Here, the record shows the jury was still listening to playbacks of testimony when the judge discharged Juror No. 3 and replaced her with an alternate juror. The record supports the court's finding that the jury was still deliberating, and the other members of the jury had not made any findings of fact or decisions on defendant's guilt or innocence. Moreover, unlike the juror in Jenkins, the discharged juror in this case never stated that the other jurors had come to a decision on defendant's guilt or innocence. Therefore, defendant's reliance upon Jenkins is misplaced.

III.

Defendant argues that the trial judge erred in certain evidentiary rulings. He contends that even if these errors are considered harmless, individually and cumulatively, the claimed errors require reversal of his conviction.

A-5462-17T4

A.  M.P.'s Statement to M.B.

Defendant argues that the trial judge erred by finding M.P.'s statement to M.B. that defendant raped her when she was thirteen years old was admissible as a fresh complaint.

Ordinarily, a third party's testimony about a victim's out of-court description of an alleged assault is inadmissible hearsay evidence.  N.J.R.E. 802. The fresh-complaint rule is a common law exception to this rule that "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." State v. Hill, 121 N.J. 150, 151 (1990); State v. W.B., 205 N.J. 588, 616 n.14 (2011).

The purpose of the rule is to "allow[] the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated."  State v. R.K., 220 N.J. 444, 455 (2015) (citing Hill, 121 N.J. at 163).  "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." R.K., 220 N.J. at 455 (citing W.B., 205 N.J. at 616).

"The determination whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to the discretion of the trial court." State v. L.P., 352 N.J. Super 369, 380-81 (App. Div. 2002) (citing Hill, 121 N.J. at 167-68). We may find an abuse of discretion if the court made a "clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001).

Here, defendant does not dispute that M.P. made the statement to a person she "would ordinarily turn to for support." He argues that the judge erred by finding that M.P. reported the sexual assault within a reasonable time. We disagree.

M.P. told her aunt defendant sexually assaulted her when she was thirteen years old. She testified that defendant raped her in February 2005. She did not report the abuse until she January 2016, when her aunt found the video showing defendant and M.P. having sex.

The record supports the judge's finding that M.P.'s failure to report the assault while M.P. was a minor was reasonable. M.P. testified that defendant repeatedly assaulted her while she was a minor. M.P. said she was afraid that her mother would send her back to the Philippines if she found out about the assaults.

Furthermore, M.P.'s failure to report the sexual assault until January 2016, when she was twenty-four years old, also was reasonable. As M.P. explained, at that time she was still living with her mother and defendant and attending college. She was embarrassed about her relationship with defendant and concerned about the effect disclosure of the earlier sexual assaults would have on the family.

The court's finding was consistent with W.B. In that case, D.L was the defendant's stepdaughter. 205 N.J. at 597. Her boyfriend J.C. testified that when she was sixteen years old, D.L. told her that the defendant sexually abused her when she was fourteen years old. Ibid. The Court held that J.C.'s testimony was admissible under the fresh complaint rule. Id. at 617-19.

The Court noted that the requirement that a sexual assault be reported in a reasonable time is applied flexibly in cases involving child victims of such assaults. Id. at 618 (citing L.P., 352 N.J. Super. at 382). The Court pointed out that D.L. told J.C. she had not previously reported the assault because she was "scared." Ibid.

In addition, at the time of her disclosure, D.L. was in "open rebellion" against her mother and the defendant because they did not like J.C. Ibid. The Court stated that

the lapse of time between the attacks and disclosure are relevant factors in determining the "reasonableness" of the interval before disclosure. However, D.L., as [the] defendant's stepdaughter, appears to have lived with defendant at least some of the time during that interval and also indicated to J.C. that she was afraid to report the abuse. Both are factors that impact the determination of "reasonableness."

[Id. at 618-19.]

Here, the trial court considered the relevant factors for determining whether M.P. reported the sexual assault within a reasonable time. The factors are essentially the same as those considered in W.B. We recognize that a considerable period of time passed between the initial assault in February 2005 and M.P.'s statement to her aunt in January 2016. However, the record supports the trial court's finding that the delay in reporting the assault was reasonable under the circumstances.

Defendant further argues that M.P. did not report the sexual assault voluntarily or spontaneously. Again, we disagree. In addressing this issue, we "must recognize that in a given case the victim may have made the complaint in response to questioning." State v. Bethune, 121 N.J. 137, 144 (1990). Moreover, "non-coercive questions do not rob a complaint of its admissibility under the fresh-complaint rule." Ibid. "[T]he victim's statement must at least

19

be self-motivated and not extracted by interrogation." State v. J.S., 222 N.J. Super 247, 253 (App. Div. 1988).

As stated previously, in January 2016, M.B. found the video recording that showed defendant and M.P. having sexual relations. She asked M.P. how long the relationship was going on. Initially, M.P. stated that she did not know what M.B. was talking about. She then said defendant raped her when she was thirteen years old. The record supports the trial court's finding that M.P.'s statement was spontaneous and voluntary and made in response to non-coercive questions.

We are also convinced that if the court erred by admitting the fresh complaint evidence, the error was not "clearly capable of producing an unjust result." R. 2:10-2. Here, the judge provided the jury with a detailed instruction regarding its use of the fresh complaint testimony. The judge explained that fresh complaint evidence is not evidence that a sexual offense occurred or that M.P. is credible.

The judge stated that such evidence is admitted for a "narrow purpose," which is "to negate the inference that [M.P.] failed to tell anyone about the sexual offense and that, therefore her later assertion could not be believed." The judge added that evidence

merely serves to negate any inference that because of her assumed silence the offense did not occur. It does not strengthen her credibility. It does not prove the underlying truth of the sexual offense. A fresh complaint only dispels any negative inference that might be made from her assumed silence.

The judge went on to explain that the jury should consider all relevant factors in determining if M.P. made the complaint, including her age and demeanor, the timeliness of the complaint, the delay in making the complaint, and whether M.P. volunteered the complaint or whether it was the result of interrogation.

The judge further explained that the law recognizes that there are stereotypes about sexual offenses, which may lead some of the jurors to question M.P.'s credibility based solely on the fact that she did not complain about the alleged abuse sooner. The judge stated:

> You may or may not conclude that [M.P.'s] testimony is untruthful based on her silence or delayed disclosure. You may consider that the silence or delayed disclosure, along with all of the other evidence, including [M.P.'s] explanation for her silence to delayed disclosure when you decided how much weight to afford [M.P.'s] testimony.

As we stated previously, M.P. provided detailed testimony about the sexual assaults, stating that they began when she was thirteen years old and continued until she was eighteen. Defendant denied engaging in any sexual

21

activity with M.P. before she was eighteen years old. The jury had the opportunity to assess the credibility of defendant and M.P.

The fresh complaint evidence was admitted only to negate the inference that the assaults did not occur because M.P. did not report them earlier. We are convinced the admission of this evidence did not have the clear capability of causing the jury to reach a decision "it otherwise might not have reached." State v. McGuire, 419 N.J. Super. 88, 106-07 (App. Div. 2011) (quoting State v. Taffaro, 195 N.J. 442, 454 (2008)).

B.   Admission of E.M.'s Prior Statement.

Defendant argues that the trial judge erred by allowing the State to admit a statement that E.M. made when she was interviewed by a detective in the Union County Prosecutor's Office (UCPO). Defendant contends the statement was hearsay and not admissible under the rules of evidence.

Generally, hearsay is an out-of-court statement admitted "to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c)(1) and (2). However, N.J.R.E. 803(a)(1) permits a declarant's prior statement to be admitted if it was made by a witness at trial who is subject to cross-examination and "is inconsistent with the declarant-witness' testimony at the trial . . . ." We review

the trial court's evidentiary ruling under an abuse-of-discretion standard.  State v. Nantambu, 221 N.J. 390, 402 (2015).

At trial, M.P. testified that in the summer of 2004, E.M. saw defendant kissing her.  When the assistant prosecutor asked E.M. about this incident, she said she did not see defendant and M.P. kiss but rather saw them standing with a "look on their face that they were doing something."  However, in January 2016, when E.M. was interviewed by a detective in the UCPO, she stated that she had seen defendant kiss M.P.  Furthermore, when she was asked whether defendant admitted kissing M.P., E.M. responded, "I don't remember.  Probably."

The trial court allowed excerpts of the interview to be admitted under N.J.R.E. 803(a)(1) as a prior inconsistent statement of a witness.  The excerpts included the following exchange:

> [THE DETECTIVE]: Okay. And are you aware of the allegation of a sexual assault by your husband, Renato, against your daughter, [M.P.]?
>
> [E.M.]: Yes.
>
> [THE DETECTIVE]: Okay. What do you know about that or how did you find out?
>
> [E.M.]:  As far as I remember, when they came out the bedroom I saw them in the kitchen in Hillside.  He's kissing her.  They were playing Scrabble at that time.

On appeal, defendant argues that the trial judge should have only allowed the State to admit E.M.'s prior statement that she saw defendant kissing M.P. Defendant contends the trial court erroneously allowed the jury to hear "not only the substance of what [E.M.] told the detective she saw, but also . . . how she learned about the sexual assault allegation at issue in this case."

The trial judge admitted the entire excerpt because it provided the context for E.M.'s statement that she observed defendant kiss M.P. The judge properly ruled that the detective's questions also were admissible. As the judge found, the inquiry provided the context for E.M.'s response, which was how she learned about defendant's relationship with M.P. The judge's ruling was not an abuse of discretion.

C.  Rape Shield Law (RSL).

Defendant argues that the trial judge erred by precluding his attorney from questioning M.P. about her sexual relationship with her boyfriend. As noted previously, defendant claimed his sexual relationship with M.P. began in 2011, when she was nineteen years old and attending college.

Defendant testified that one evening, he and M.P. were talking. According to defendant, M.P. began to ask him questions about sex and she spoke about her boyfriend. Defendant stated that "basically one thing led to

24                                                      A-5462-17T4

another and we had sex." The judge refused to allow defendant to testify that the conversation began after he observed a hickey on M.P.'s neck, which prompted her to tell him that her boyfriend had been there earlier and they had sex.

The judge found that testimony about M.P.'s sexual relationship with her boyfriend was unduly prejudicial to her and neither relevant nor material to the charged offenses. The judge ruled that defendant could testify about his sexual encounter with M.P. "without bringing in her sexual relationship with another person or evidence that he observed a hickey on her neck."

On appeal, defendant argues that the judge erred by refusing to allow him to testify about M.P.'s sexual relationship with her boyfriend. He contends such testimony would not have been prejudicial to M.P. He contends the judge's ruling left the jury without a clear explanation for why he and M.P. began to talk about sex, which made his testimony appear "hollow and implausible."

The RSL provides in pertinent part that "evidence of the victim's previous sexual conduct [with persons other than the defendant] shall not be admitted nor reference made to it in the presence of the jury" except if "material to proving the source of semen, pregnancy or disease." N.J.S.A. 2C:14-7(a), (c). The RSL precludes the admission of evidence intended "to cast the victim as promiscuous

or of low moral character." State v. J.D., 211 N.J. 344, 355 (2012) (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)).

To ensure that application of the RSL does not unduly infringe on a defendant's constitutional right to a fair trial, the court undertakes a two-step analysis. State v. Perry, 225 N.J. 222, 236 (2016). The trial court first must determine "whether evidence encompassed under the [RSL] is relevant and necessary to resolve a material issue in light of the other evidence that is available to address that issue." Id. at 236-37.

If the evidence is relevant, the court then must determine "whether, under N.J.R.E. 403, the probative value of the contested evidence outweighs the prejudicial effect to the victim in the context of the [RSL]." Id. at 237. We review the court's evidentiary ruling for abuse of discretion. Id. at 233.

We are convinced the judge did not err by precluding defendant from testifying about M.P.'s sexual activity with her boyfriend and the mark defendant observed on her neck. That testimony had no relevance to whether defendant sexually assaulted M.P. from the time she was thirteen until she was eighteen years old, as charged in the indictment.

Moreover, allowing defendant to testify about M.P.'s sexual activity with another person would have resulted in "an unnecessary invasion of her privacy."

Id. at 235 (quoting State v. Garron, 177 N.J. 147, 153 (2003)).  We conclude the judge's application of the RSL did not deny defendant of his right to present a complete defense and it was not an abuse of discretion.

### D.  Cumulative Error.

As noted, defendant contends that even if the judge's evidentiary rulings are individually determined to be harmless error, they require reversal of his conviction when viewed cumulatively.  The contention lacks sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

## IV.

Defendant argues his sentence is manifestly excessive.  He contends the judge erred by failing to find certain mitigating factors and by imposing a consecutive sentence.

We review the trial court's sentencing determinations "in accordance with a deferential standard."  State v. Fuentes, 217 N.J. 57, 70 (2014).  "The reviewing court must not substitute its judgment for that of the sentencing court."  Ibid.  Therefore, this court

> must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the

A-5462-17T4

facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge also found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no history of prior delinquency or criminal activity). The judge determined that the aggravating factors substantially outweighed the one mitigating factor.

On count one (first-degree aggravated sexual assault), the judge sentenced defendant to a term of sixteen years of incarceration, with an eighty-five percent period of parole ineligibility pursuant to the NERA, with five years of parole supervision upon release. The judge ordered defendant to comply with the reporting and registration requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23, and parole supervision for life.

The judge merged count three (second-degree sexual assault) with count one and sentenced defendant on count two to a consecutive term of seven years, without a period of parole ineligibility. On count four (second-degree

28

endangering the welfare of a child), the judge sentenced defendant to a concurrent seven-year term, also without a period of parole ineligibility. The judge ordered that defendant shall have no contact with M.P.

Defendant argues that the trial court erred by refusing to find mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct the result of circumstances unlikely to recur); and mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) (defendant's character and attitude indicate he is unlikely to commit another offense). He contends the offenses were specific to M.P. and she has removed herself from future risk.

However, the record supports the trial judge's finding that there was a risk that defendant would commit another offense. The judge noted that defendant had committed multiple offenses over "a course of years" and escaped detection "for many years."

Defendant further argues that the court erred by refusing to find mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment would entail excessive hardship to defendant or his dependents). He contends he would suffer hardship if imprisoned because he has a heart condition that requires a pacemaker and has a disability that causes him to limp. The judge appropriately

A-5462-17T4

found, however, that the State's prison system has medical personnel that can deal with these issues.

In addition, defendant argues that the trial judge did not provide sufficient reasons for imposing a consecutive sentence on count two. Trial judges have "discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011) (citing N.J.S.A. 2C:44-5(a)).

When deciding whether to impose concurrent or consecutive sentences, the court considers the following guidelines established in State v. Yarbough, 100 N.J. 627, 643-44 (1985):

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed

so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .[2]

Here, the judge observed that the State had presented evidence indicating that defendant began to sexually assault M.P. when she was twelve years old, and his actions included the touching of her intimate parts and kissing. The judge found defendant had committed crimes independent of the aggravated sexual assault at different times and in different places. They were separate acts. The judge therefore decided to impose a consecutive sentence for the sexual assault charged in count two.

Defendant argues that the judge commented that the aggravated sexual assault in count one was independent of the endangering count in count four and

---

[2] Yarbough included a sixth guideline placing an "outer limit" on the cumulation of consecutive sentences. Id. at 644. This guideline was eliminated by an amendment to N.J.S.A. 2C:44-5(a) enacted in 1993. L. 1993, c. 223.

yet only imposed consecutive sentences on counts one and two. He further argues that the judge's findings lacked sufficient detail. We find no merit in either argument. It is irrelevant that the judge could have imposed a consecutive sentence on count four and did not. The judge provided sufficient reasons for requiring the sentence on count two to be served consecutively to the sentence on count one.

Therefore, we reject defendant's contention that his sentence is excessive. The judge properly applied the sentencing guidelines. The sentences imposed, including the consecutive sentences on counts one and two, are not unreasonable and do not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5462-17T4