**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5935-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KENNETH D. HARDEN,
a/k/a KENNETH HARDEN,
and BK BABY K,

     Defendant-Appellant.

_____

Argued January 13, 2021 – Decided June 10, 2021

Before Judges Accurso, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment Nos. 17-03-0190 and 17-04-0387.

Peter T. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the brief).

Andre R. Araujo, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae,

Cumberland County Prosecutor, attorney; Andre R. Araujo, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Kenneth D. Harden of unlawful possession of a weapon, certain persons not to have weapons, and possession of a controlled dangerous substance (CDS). The court imposed an aggregate twenty-year sentence with a ten-year period of parole ineligibility. Defendant appeals from his convictions and sentence, and we reverse and remand for a new trial because the court erred by denying defendant's motion to suppress statements he made during a custodial interrogation and by improperly instructing the jury it was obligated to reach a unanimous verdict after reporting it was deadlocked.

I.

In November 2016, a grand jury indicted defendant for charges arising out of an April 29, 2016 incident during which a handgun and heroin were found in an automobile defendant was observed driving and had just exited. The indictment charged defendant with: second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); third-degree possession of CDS, heroin, N.J.S.A. 2C:35-10(a)(1); third-degree possession with intent to distribute CDS, heroin, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3); third-degree possession with intent to distribute CDS in a school zone, N.J.S.A. 2C:35-7(a); and second-degree

possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(b)(1). Defendant was represented by counsel at his January 17, 2017 arraignment on the charges in the indictment.

On February 1, 2017, defendant was arrested on charges arising out of an alleged attempted murder on April 28, 2016, the day before the incident that gave rise to the offenses charged in the indictment. Ballistics testing revealed the gun used in the April 28, 2016 alleged attempted murder was the same gun recovered from the automobile on April 29, 2016 and for which defendant was charged with possessory offenses in the indictment.

Immediately following his arrest on February 1, 2017, a detective spoke with defendant. Prior to advising defendant of his Miranda[1] rights and outside of the presence of counsel representing defendant on the charges in the indictment, the detective told defendant the gun used in the alleged attempted murder was the same gun defendant "got caught with" the following day. In response, defendant said, "I wasn't the only one in the car with that gun." Defendant later also stated, "It wasn't my gun."

In April 2017, a grand jury returned a superseding indictment that included charges related to the April 28 and 29, 2016 incidents. The indictment

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

charged that on April 28, 2016, defendant committed the following offenses: second-degree possession of a community gun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(2), and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). The indictment charged the following offenses related to the April 29, 2016 incident involving the automobile: second-degree possession of a weapon while committing the offense of possession of heroin with intent to distribute, N.J.S.A. 2C:39-4.1(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3); and third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1). The superseding indictment also charged defendant with second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1), on April 28 and 29, 2016.

The court later dismissed all charges based on the alleged April 28, 2016 incident. A bifurcated trial proceeded on the five charges arising out of the April 29, 2016 incident. Prior to trial, defendant moved to suppress the February 1, 2017 statements he made to the detective following his arrest on the charges related to the April 28, 2016 incident. Defendant argued the statements were obtained in violation of his Miranda rights and his right to remain silent. The court held an evidentiary hearing and denied the motion, finding that although

4

defendant was in custody when the statements were made, the statements were not the product of an interrogation. Defendant moved for reconsideration, arguing the court erred in the first instance by denying the motion and also that the statements were obtained in violation of his right to counsel who, at the time, represented him in connection with the then-pending initial indictment charging him with the offenses related to the April 29, 2016 automobile incident. The court denied the reconsideration motion.

The evidence at trial showed that on April 29, 2016, officers were looking for defendant and observed him driving a silver Chevy Impala that was registered to his mother. A detective testified he had previously seen defendant driving the car, but he did not know who else had access to it and he had not seen defendant driving it on the days immediately prior to April 29.

Shortly after the officers saw the car, defendant drove it into a parking lot, stopped, and got out. Officers immediately approached defendant, who was the car's sole occupant. While the officers waited for a tow truck to move the car to another location to be searched, defendant's mother appeared and asked to take the car. The officers denied the request.

A subsequent search of the car revealed: a loaded handgun magazine in the center console; a loaded, operable handgun under the front passenger seat;

A-5935-17

and a brown box under the front passenger seat in which the officers found a digital scale, 137 unused wax paper folds, and a plastic bag containing 2.5 grams of heroin. The search of the car's center console also yielded a pill bottle for an April 26, 2016 prescription issued to defendant, and a bank card and identification card, both of which were issued in defendant's name. In the car's trunk, officers found a piece of mail dated April 5, 2015, addressed to defendant. The State tested the gun for fingerprints and DNA, but none was discovered linking defendant to the weapon.

Defendant argued at trial the State failed to prove beyond a reasonable doubt the gun belonged to him or was possessed by him. Defendant asserted the car was not registered to him; others, including his mother, had access to it; and the State lacked forensic evidence linking him to the weapon. The State argued the other items found in the car—each of which referred to defendant—showed defendant had control over, and possessed, all the items in the car. The State also argued defendant's February 1, 2017 statement to the detective—that defendant "wasn't the only one in the car with that gun. Guns get passed around all the time"—was, "at the very least," an admission by defendant that he jointly possessed the gun.

6

In the initial phase of the bifurcated trial, the jury found defendant not guilty of possession of heroin with intent to distribute and unlawful possession of a weapon while committing a CDS offense. The jury found defendant guilty of second-degree unlawful possession of a weapon and third-degree unlawful possession of heroin. In the second phase of the trial, the jury found defendant guilty of second-degree certain persons not to have weapons.

At sentencing, the court found aggravating factors three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), six, the nature and extent of defendant's prior record, N.J.S.A. 2C:44-1(a)(6), and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9); found no mitigating factors, see generally N.J.S.A. 2C:44-1(b)(1) to (14); and determined the aggravating factors substantially outweighed the mitigating factors. The court sentenced defendant to eight years with a four-year period of parole ineligibility for second-degree unlawful possession of a weapon, to run concurrently with defendant's four-year sentence for third-degree possession of CDS, heroin. The court also imposed an extended term twelve-year sentence with a six-year period of parole ineligibility on defendant's conviction for second-degree certain persons not to have weapons, to run consecutively to the sentence imposed on the unlawful possession of a weapon

7

and possession of CDS charges.  Thus, the court imposed an aggregate twenty-year sentence with a ten-year period of parole ineligibility on the charges in the superseding indictment.  The court further directed that the twenty-year aggregate sentence run consecutive to concurrent five-year sentences the court imposed on charges in an unrelated indictment to which defendant pleaded guilty following his convictions at trial.[2]

Defendant appealed from his convictions and the sentence imposed on the charges in the superseding indictment.  He offers the following arguments on appeal:

> POINT I
>
> [DEFENDANT'S] STATEMENTS SHOULD BE SUPPRESSED AND A NEW TRIAL SHOULD BE GRANTED (A) BECAUSE OF A VIOLATION OF HIS SIXTH-AMENDMENT RIGHT TO COUNSEL AND (B) BECAUSE OF A FIFTH-AMENDMENT MIRANDA VIOLATION.
>
> A.  The Detective Should Not Have Tried to Question [Defendant] About the Indicted Case Because [Defendant's] Assigned Counsel Was Not Present.

---

[2]  Following trial on the charges in the superseding indictment but prior to sentencing, defendant pleaded guilty to two CDS-related charges in another indictment (Indictment 17-03-0190) that was unrelated to the charges arising from the April 29, 2016 incident.  Defendant was sentenced on those unrelated charges the same day he was sentenced for his convictions by the jury.  Defendant does not appeal from his convictions or sentence under Indictment 17-03-0190.

8

B. Alternatively, the Detective Should Have Administered <u>Miranda</u> Warnings Before Confronting [Defendant] with the Evidence and Asking Him to Talk Because this Discussion Was Reasonably Likely to Elicit an Incriminating Response.

POINT II

THE TRIAL COURT COMMIT[T]ED PLAIN ERROR BY CONTRADICTING THE BEYOND-A-REASONABLE-DOUBT STANDARD AND INSTRUCTING THAT THE JURORS COULD CONVICT IF THEY INFERRED THAT POSSESSION WAS "MORE PROBABLE THAN NOT."

POINT III

THE TRIAL COURT PLACED UNDUE PRESSURE ON THE DELIBERATING JURY TO REACH [AN] AGREEMENT BY ORDERING ONE JUROR TO CONTINUE DELIBERATING WITHOUT ADEQUATELY INQUIRING INTO HER REQUEST TO BE EXCUSED AND THEN DELIVERING AN UNBALANCED INSTRUCTION TO THE DEADLOCKED JURY THAT IMPOSED AN "OBLIGATION" TO AGREE.

POINT IV

[DEFENDANT] SHOULD BE RESENTENCED BECAUSE THE COURT FAILED TO APPLY THE <u>YARBOUGH</u>[3] FACTORS IN IMPOSING CONSECUTIVE SENTENCES ON TWO GUN POSSESSION CHARGES THAT WERE BASED ON THE SAME GUN AND BECAUSE THOSE

---

[3] <u>State v. Yarbough</u>, 100 N.J. 627 (1985).

9

FACTORS WOULD HAVE WEIGHED OVERWHELMINGLY AGAINST SUCH A SENTENCE.

We address each of defendant's arguments in turn.

II.

Defendant argues his convictions should be reversed because the court erred by denying his motion to suppress statements he made following his February 1, 2017 arrest and by admitting the statements at trial. More particularly, he contends his statements were improperly obtained during a custodial interrogation without the administration of <u>Miranda</u> rights. He also contends the detective violated his Sixth Amendment right to counsel by speaking to him about the alleged April 28, 2016 attempted murder involving the same gun he was under indictment for possessing on April 29, 2016, in the absence of the attorney representing him on the charges in the indictment.

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" <u>State v. A.M.</u>, 237 N.J. 384, 395 (2019) (quoting <u>State v. S.S.</u>, 229 N.J. 360, 374 (2017)). An appellate court should not disturb a trial court's findings unless "they are so clearly mistaken 'that the interests of justice demand intervention and

correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). "An appellate court owes no deference, however, to 'conclusions of law made by lower courts in suppression decisions'" and reviews such decisions de novo. A.M., 237 N.J. at 396 (quoting State v. Boone, 232 N.J. 417, 426 (2017)).

A.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). To protect a person's right against self-incrimination, a person in custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
>
> [Miranda v. Arizona, 384 U.S. 436, 479 (1966).]

The purpose of the Miranda warnings is to protect a suspect from the "inherently coercive atmosphere of custodial interrogation." A.M., 237 N.J. at 397.

"Miranda warnings are required 'whenever a person in custody is subjected to either express questioning or its functional equivalent.'" State v.

11

Wright, 444 N.J. Super. 347, 363 (App. Div. 2016) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)); see also In re A.A., 240 N.J. 341, 354 (2020) (explaining our Supreme Court "has adopted the Innis standard"); State v. Bey, 112 N.J. 45, 68 n.13 (1988) (adopting the Innis standard for defining an interrogation in New Jersey). For purposes of the administration of Miranda rights, an interrogation consists "not only [of] express questioning, but also . . . any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [whether inculpatory or exculpatory] from the suspect." Wright, 444 N.J. Super. at 364 (fourth alteration in original) (quoting Innis, 446 U.S. at 301). "The latter portion of the definition" of interrogation—pertaining to words or actions the police should know are reasonably likely to elicit an incriminating response—"focuses primarily on the perceptions of the suspect, rather than the intent of the police." State v. Mallozzi, 246 N.J. Super. 509, 515 (App. Div. 1991) (citing Innis, 446 U.S. at 301). An "incriminating response" is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." State v. Ward, 240 N.J. Super. 412, 418 (App. Div. 1990) (quoting Innis, 446 U.S. at 301 n.5).

"[B]ooking procedures and the routine questions associated [with that process] are ministerial in nature" and do not constitute interrogation.  State v. Bohuk, 269 N.J. Super. 581, 593 (App. Div. 1994) (second alteration in original) (quoting Mallozzi, 246 N.J. Super. at 515).  Likewise, "unexpected incriminating statements made by in custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible."  State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991).

In contrast, "[t]he initiation of a general discussion about the victim clearly satisfies [the Innis] standard," as does a "generalized discussion relating to [the] investigation."  Bey, 112 N.J. at 68 n.13 (citing Christopher v. Florida, 824 F.2d 836, 845 (11th Cir. 1987)).  For example, in Wright, we found the functional equivalent of an interrogation where a defendant in custody made inculpatory statements after detectives advised him that he fit the description of the perpetrator of an armed robbery, a victim was being brought to identify him, and the officers located a gun near where the defendant stood.  444 N.J. Super. at 365-66.  We found "the officer should surely have known that his meting out of the information in the way he did was reasonably likely to evoke an incriminating response, and thus . . . it amounted to an interrogation."  Id. at 366.  In Ward we found a custodial investigation under the Innis standard where a

detective visited a defendant in his cell after he had been booked and showed him photographs of two suspects in a robbery in which he was also a suspect. 240 N.J. Super. at 417. Similarly, in State v. Brown, we found a custodial interrogation where a detective gave a defendant in custody a "detailed and apparently well-prepared" presentation of evidence against him, prompting the defendant to make statements concerning the crimes under investigation. 282 N.J. Super. 538, 550 (App. Div. 1995).

Here, it is undisputed defendant was in custody when he spoke with the detective on February 1, 2017. The court, however, found defendant was not subject to an interrogation because the detective did no more than tell defendant why he had been arrested and ask if defendant wanted to talk. The court also found the detective did not "ask[ defendant] a specific question other than, do you want to talk about this?"

The court ignored that under the Innis standard, a custodial interrogation does not require direct questioning, but instead may consist of its functional equivalent, Wright, 444 N.J. Super. at 363, including a generalized discussion of the evidence against the defendant, see Bey, 112 N.J. at 68 n.13. To be sure, the detective properly advised defendant of the charges against him and inquired generally if defendant wanted to speak with him, but the detective did not stop

there. The detective moved beyond proper ministerial booking questions, see Mallozzi, 246 N.J. Super. at 514-16, and discussed the evidence against defendant. The detective explained defendant was "caught with a[] gun" on April 29, 2016 that "came back to a shooting from the day before," and defendant was therefore charged with attempted murder and possessory weapons offenses.

Moments later, the detective continued to detail the evidence against defendant, stating "this shooting happened in April or April 28 at like 9:30 around about and then 4:30 the next day you got caught with the gun, so . . . ." The detective's point was well-made; the State had a seemingly strong case against defendant because the evidence showed he possessed a handgun on April 29, 2016 that was used the day before to commit an alleged attempted murder. Defendant responded, interrupting the detective, making the inculpatory statement the State sought to be admitted at trial. Defendant said, "I wasn't the only one in the car with that gun. Guns get passed around all the time."

The detective's summary of the evidence, linking the gun defendant allegedly possessed on April 29, 2016 with the shooting that occurred hours earlier on the previous day, exceeded the permissible routine and ministerial questioning of defendant for booking and other administrative purposes that does not constitute a custodial interrogation requiring Miranda warnings. Cf.

15

Mallozzi, 246 N.J. Super. at 514-16; State v. Cunningham, 153 N.J. Super. 350, 352, 354 (App. Div. 1977). The detective's failure to offer any explanation for supplying defendant with the summary of the evidence permits the inference the detective's explanation was not provided inadvertently. Wright, 444 N.J. Super. at 366. The detective's summary of the evidence linking defendant to the attempted murder represented a subtle but effective coercive strategy that evoked defendant's inculpatory statements.

Defendant's statements were "not simply a spontaneous outburst elicited casually or innocently without the State's purposeful enticement or encouragement." Ward, 240 N.J. Super. at 417. Defendant responded, as could reasonably be expected when he was confronted with seemingly compelling evidence he committed a very serious crime, with a statement refuting the detective's claim he was "caught with [the] gun" allegedly involved in the attempted murder. See Wright, 444 N.J. Super at 366. Thus, the detective's summary of that evidence was the functional equivalent of an interrogation that first required the administration of Miranda warnings. See Bey, 112 N.J. at 68 n.13; Wright, 444 N.J. Super. at 365-67. The failure to provide the warnings prior to defendant making the statements required suppression of the statements at trial. See State v. Hubbard, 222 N.J. 249, 272 (2015) (finding statements

16

made during a custodial interrogation without the administration of Miranda warnings "must be suppressed").  The court erred by finding otherwise.

### B.

Defendant also claims his statements to the detective should have been suppressed because he was deprived of his right to counsel.  Both our federal and state constitutions guarantee the right to counsel in a criminal prosecution. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.  "[T]he right to counsel 'is triggered when "adversary judicial proceedings have been initiated."'"  State v. A.G.D., 178 N.J. 56, 63 (2003) (quoting State v. Sanchez, 129 N.J. 261, 265 (1992)); see also Kirby v. Illinois, 406 U.S. 682, 688 (1972).  It is undisputed that an "[i]ndictment triggers the onset of the formal adversarial judicial process."  State v. Wint, 236 N.J. 174, 203 (2018); see also Kirby, 406 U.S. at 688-89.

The "Sixth Amendment right to counsel is 'offense specific' in its attachment."  State v. Harris, 181 N.J. 391, 435 (2004); see also Texas v. Cobb, 532 U.S. 162, 164 (2001).  Our Supreme Court has observed, however, that "[i]f the offense under investigation is based on essentially the same factual context as the charged offense, assertion of the Sixth Amendment right to counsel on the charged offense should bar police-initiated interrogation on the related

17

offense." State v. Tucker, 137 N.J. 259, 278 (1994). On the other hand, the police may interview a represented defendant "concerning a totally unrelated" offense. Id. at 276 (citing McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991)).

The alleged April 28 and 29, 2016 incidents involved some separate offenses. The April 29, 2016 incident included possessory CDS offenses, and the April 28, 2016 incident included allegations of attempted murder. The incidents, however, share a common factual context and criminal offenses that were at the center of the detective's February 1, 2017 interrogation of defendant. In both incidents, defendant was accused of unlawful possession of the same handgun, and, more importantly, as explained by the detective on February 1, 2017, defendant's alleged possession of the handgun on April 29, 2016, established his participation in the attempted murder with the handgun on the preceding day, April 28, 2016. The detective focused on defendant's alleged possession of the handgun on April 29, 2016, stating defendant was "caught with [the] gun," as evidence establishing defendant's participation in the alleged attempted murder on the previous day.

The detective spoke to defendant about facts common to both the new charges based on the alleged April 28, 2016 attempted murder and the April 29, 2016 possessory weapons offenses for which defendant had already been

indicted and was represented by counsel. The detective expressly sought to speak with defendant about the gun defendant had already been charged in an indictment with possessing, and the use of the gun in an alleged attempted murder.

The detective told defendant they could "[t]alk about [whose] gun it was." That comment was not limited to an inquiry about wholly unrelated offenses allegedly committed on April 28 and 29, 2016. It was directed to facts—ownership and possession of the handgun—and offenses—possessory weapons offenses—common to the April 28, 2016 alleged attempted murder, as well as to the April 29, 2016 incident for which defendant had been charged in an indictment and was represented by counsel. And the detective's questioning evoked an inculpatory statement from defendant that the State introduced at the trial on the indictment charging defendant with offenses based solely on the April 29, 2016 incident. Because defendant had been indicted and was represented by counsel on the charges in the indictment when the February 1, 2017 interrogation occurred in the absence of defendant's counsel, defendant's right to counsel was violated and his statements should have been suppressed. See Tucker, 137 N.J. at 278.

We reject the State's argument to the contrary. The State relies on Harris, claiming defendant's Sixth Amendment right to counsel was not violated. In Harris, the defendant murdered a woman with a gun and hid the body. 181 N.J. at 425. Ten days after the woman went missing, officers arrested the defendant on a weapons charge. Id. at 433. Several months later, the defendant became a suspect in the woman's disappearance, and an officer involved in the investigation encouraged the defendant's accomplice to write a letter to the defendant about the missing woman. Id. at 433-34. The defendant responded to the accomplice's letter, and his response was admitted into evidence at trial. Id. at 434-35. Notably, when officers arrested the defendant for the weapons charge, and spoke to the defendant's accomplice, they did not know the weapon the defendant was charged with possessing was also the weapon used in the woman's murder. Id. at 433.

The Court found the defendant's Sixth Amendment right to counsel had not attached to his murder charge when the officers employed the accomplice to write the letter to the defendant because the officers did not know at the time the defendant was charged with possessing the gun that it was the murder weapon, nor did the officers know it was the murder weapon when they encouraged the

accomplice to write a letter to the defendant. Id. at 435-36. Thus, the Court found no Sixth Amendment violation. Ibid.

Unlike in Harris, here the detective knew during the February 1, 2017 interrogation that the gun defendant was charged with possessing on April 29, 2016 was also the gun used in the shooting on April 28, 2016. Indeed, the detective used that fact as a means to evoke defendant's statements. In addition, the detective would have known any information defendant revealed about possession and ownership of the gun would inculpate defendant on the charges for which he had been indicted and was represented by counsel. No similar circumstances were extant in Harris.

Further, and as noted, the State admitted defendant's statements into evidence at the trial on the charges arising from the April 29, 2016 incident—charges for which defendant had been indicted when he made the statements. In contrast, in Harris, the State sought to admit the defendant's statements into evidence at the trial pertaining to the defendant's homicide charges, not the unrelated weapons charges for which the defendant's Sixth Amendment rights had attached when he made the statements. Id. at 433-36.

We are therefore convinced defendant's Sixth Amendment right to counsel was violated by the detective's February 1, 2017 interrogation. Defendant's

statements should have been suppressed for that reason.  See Sanchez, 129 N.J. at 279 (finding the defendant's statements made in violation of his Sixth Amendment right to counsel should not have been admitted at trial).

C.

Based on our review of the record, we are also persuaded that admission of defendant's statements from the February 1, 2017 interrogation in violation of his Miranda rights, his right to remain silent, and his right to counsel warrants reversal of his convictions.  Where, as here, a defendant challenged the admissibility of his or her statements obtained during an interrogation, we will not reverse a conviction unless the court's error is "clearly capable of producing an unjust result."  State v. J.R., 227 N.J. 393, 417 (2017) (quoting R. 2:10-2). We will not find an error harmless "if there is a reasonable doubt as to whether the error contributed to the verdict."  Ibid.  The error "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."  Ibid. (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

The evidence against defendant was circumstantial.  The gun and CDS found were under the passenger seat of a car defendant did not own.  There was no evidence establishing how long defendant used the car prior to him being

observed by the police driving it on April 29, 2016. We appreciate there was other evidence—the prescription bottle, bank and identification cards, and mail bearing defendant's name—that support the jury's verdict, but the State argued defendant's statements during the February 1, 2017 interrogation constituted direct evidence of defendant's possession of the gun—a purported admission by defendant that, "[a]t the very least," he jointly possessed the gun. In our view, admission of defendant's statements raises a reasonable doubt as to whether error in admitting the statements contributed to the jury's verdict because acceptance of the purported admission would have removed any doubt concerning defendant's possession of the gun and CDS otherwise hidden from view in the vehicle. The error was therefore not harmless and requires reversal of defendant's convictions.

III.

We also address defendant's argument, raised for the first time on appeal, that the court committed plain error by instructing the jurors in accordance with Model Jury Charges (Criminal), "Possession of Firearms, Weapons, Destructive Devices, Silencers or Explosives in a Vehicle (N.J.S.A. 2C:39-2)" (approved Mar. 30, 1993). Defendant claims the instruction permitted the jurors to convict him on the possessory gun offenses if they inferred possession of the handgun

was "more probable than not." Defendant argues the charge erroneously undermines the requirement that the State prove every element of a crime beyond a reasonable doubt.

Where "a defendant fails to raise an issue at trial, appellate review is governed by the plain error standard." State v. Maloney, 216 N.J. 91, 104 (2013). In a jury charge context, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Kornberger, 419 N.J. Super. 295, 301 (App. Div. 2011) (alteration in original) (quoting State v. Torres, 183 N.J. 554, 564 (2005)).

Here, the court gave the following instruction:

> With regard to the issue of possession—I'm sorry. I have previously instructed you concerning your consideration of circumstantial evidence presented in this case.
> That is, you may infer a fact from other facts in the case if you find it more probable than not that the inferred fact is true.
> Evidence has been presented that a handgun was found in the vehicle. If you find that the [d]efendant was the sole occupant of the vehicle, you may infer that this occupant possessed the handgun.
> Furthermore, if you find that the vehicle had more than one occupant, you may infer that the

handgun was possessed by all of the occupants. You are never required or compelled to draw any inference.

It is your exclusive province to determine whether the facts and circumstances shown by the evidence support any inferences and you are always free to accept or reject them, if you wish.

The instruction is identical in all material respects to the model jury charge. See Model Jury Charges (Criminal), "Possession of Firearms, Weapons, Destructive Devices, Silencers or Explosives in a Vehicle (N.J.S.A. 2C:39-2)" (approved Mar. 30, 1993).

We disagree with defendant's claim the model jury charge permitted the jurors to "convict if they inferred that possession [of the handgun] was 'more probable than not.'" The model jury charge is derived from N.J.S.A. 2C:39-2, which states in relevant part, "When a firearm . . . is found in a vehicle, it is presumed to be in the possession of the occupant if there is but one. If there is more than one occupant in the vehicle, it shall be presumed to be in the possession of all . . . ." N.J.S.A. 2C:39-2(a). In State v. Bolton, we considered N.J.S.A. 2C:39-2 and determined a jury could not be instructed that it may "presume" something; instead, "the jury may be advised that it can draw an inference if it finds it more probable than not that the inference is true." 230 N.J. Super. 476, 480 (App. Div. 1989).

The Supreme Court has also explained that "[a]n inference reasonably may be drawn when 'it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference.'" State v. Thomas, 132 N.J. 247, 256 (1993) (quoting State v. Brown, 80 N.J. 587, 592 (1979)). The Court has cautioned, however, that "the State must still be held to its burden of proving each element of [an] offense beyond a reasonable doubt." Ibid. An inference charge "reduce[s] the burden of persuasion below a 'reasonable doubt' standard," but "only if the jury were compelled to draw the inference and convict on th[at] basis . . . alone." State v. Humphreys, 54 N.J. 406, 415 (1969) (quoting State v. DiRienzo, 53 N.J. 360, 376 (1969)). Thus, a court must inform a jury that "an inference of one fact from another is never binding." Ibid.

In our assessment of a challenge to a jury charge, we must read the charge "'as a whole in determining whether there was any error,' and the effect of any error must be considered 'in light of the overall strength of the State's case.'" State v. Gonzalez, 444 N.J. Super. 62, 70-71 (App. Div. 2016) (citations omitted). Although "trial courts and counsel must review charges for potential error, even in model jury charges," State v. Docaj, 407 N.J. Super. 352, 370 (App. Div. 2009), courts should also instruct the jury using the applicable model

jury charges that are "consistent" with our laws, see State v. Rodriguez, 365 N.J. Super. 38, 53 (App. Div. 2003); see also State v. R.B., 183 N.J. 308, 325 (2005); Flood v. Aluri-Vallabhaneni, 431 N.J. Super. 365, 383-84 (App. Div. 2013).

Here, the court relied on the model jury charge, which was applicable based on the evidence presented and consistent with N.J.S.A. 2C:39-2 and case law concerning presumptions and inferences in jury charges. See, e.g., Bolton, 230 N.J. Super. at 479-81. The court did not instruct the jury to rely on any "presumptions," and it expressly instructed the jurors they were "never required or compelled to draw any inference." See Humphreys, 54 N.J. at 415 (quoting DiRienzo, 53 N.J. at 376). Also, in its instructions on the elements of unlawful possession of a handgun, the court repeated on four separate occasions that the State must prove each element of the crime beyond a reasonable doubt. We may properly assume the jury followed the instructions, see State v. Ross, 229 N.J. 389, 415 (2017), which properly explained the manner in which an inference may be drawn and required that a conviction rest solely on proof of each element of possession beyond a reasonable doubt. We therefore find no error in the court's use of the model jury charge based on the record presented.

IV.

Defendant also argues he was deprived of his due process rights because the court placed undue pressure on the jurors to reach a unanimous decision by requiring Juror Number Two to deliberate after she indicated jury service prevented her from earning the income required to support her family and by advising the jury it had an obligation to reach a unanimous verdict after it reported it was deadlocked. Defendant contends the court's interaction with Juror Number Two, followed by its instruction to the jury, was unduly coercive and warrants a new trial.

A.

A trial court's decision to remove a juror rests within its discretion. See State v. Williams, 171 N.J. 151, 162 (2002) (quoting R. 1:8-2(d)). "[J]udicial discretion means legal discretion in the exercise of which the court must take account of the law applicable to the particular circumstances of the case and be governed accordingly. Implicit is conscientious judgment directed by law and reason and looking to a just result." State v. Madan, 366 N.J. Super. 98, 110 (App. Div. 2004) (quoting Wasserstein v. Swern & Co., 84 N.J. Super. 1, 6 (App. Div. 1964)). A court abuses its discretion when its "decision is 'made without a rational explanation, inexplicably depart[s] from established policies, or rest[s]

on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"Rule 1:8-2(d)(1) governs the removal and substitution of jurors in civil and criminal trials, both before and after the commencement of deliberations." State v. Jenkins, 182 N.J. 112, 123 (2004). Once deliberations have begun, a deliberating juror may be replaced with an alternate juror only in limited circumstances, including death, illness, or "other inability to continue." Id. at 123-24 (quoting R. 1:8-2(d)(1)). "Although the 'death' and 'illness' standards are narrow, the 'inability-to-continue' standard has been acknowledged to be somewhat vague and broad; accordingly, the Court has construed and applied it narrowly." Williams, 171 N.J. at 163.

Our Supreme Court recognizes financial hardship may meet Rule 1:8-2(d)'s inability-to-continue standard. Id. at 167. Courts must be careful, however, in determining whether removal of a juror is appropriate. Before dismissing a juror due to financial hardship, the "trial court should determine that the financial hardship is sufficiently significant to justify excusing the juror during deliberations, and would be likely to prevent the juror from concentrating on and participating fully in the deliberations of the jury." Id. at 168.

The court must also ensure a juror's removal does not stem from the deliberative process. Jenkins, 182 N.J. at 124-25. "A deliberating juror may not be discharged and replaced with an alternate unless the record 'adequately establishes that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'" State v. Musa, 222 N.J. 554, 566 (2015) (quoting Jenkins, 182 N.J. at 124-25).

During deliberations, Juror Number Two asked to be excused because she would "not be able to feed [her] family" if she missed more days of work, and it was "causing [her] anxiety needing to take medication." The court then addressed the request with Juror Number Two:

> The Court: So I got your note. So what's going on? When we questioned Number Two when I read those questions off whether there's going to be a significant financial problem, I usually excuse jurors when they tell me, I'm not going to be able to feed my family.
>
> . . .
>
> [Juror Number Two]: I didn't say that because I've never had to deal with this so thinking it would be okay is different than actually experiencing it. . . . So now that I'm experiencing the reality that I'm not going to be getting a paycheck, it's starting to sink that this is—I'm not going to be able to (inaudible).
>
> The Court: Okay. What are your normal hours and who do you work for?

[Juror Number Two]: I work for Robin's Nest. I'm a registered nurse. I do home visits Monday through Friday, 8:00 to 4:00.

The Court: Okay.

[Juror Number Two]: And I'm the breadwinner in my family. I have three kids. I have a house and bills, so—

The Court: Do you have other people that are coming in? Because you're here already you've missed your appointments today. Somebody had to make arrangements for you today?

[Juror Number Two]: No. . . . It doesn't work like that. I schedule my own visits, so like yesterday you sent us home, I was able to go on a couple visits. So fortunately I did get a few hours in yesterday.

The Court: Okay. And see because I don't know how long deliberations are going to last. I don't ask those questions. I'm not involved in that at all. So you would be able to make arrangements to do something like after hours then if you want to make appointments that way through the home health stuff?

[Juror Number Two]: If my clients can—

The Court: Can accommodate that?

[Juror Number Two]: —do that. Most of these moms don't want to be seen at night because their babies—

. . .

31

The Court: Okay. So you're here already for the day. . . . I need to make sure that your reason for wanting to leave or to try and be excused at this point after the trial is already in deliberations, I want to make sure it has nothing to do with what's going on in that deliberation room.

[Juror Number Two]: No, it's—

The Court: It is not. Okay. You don't have to tell me anything else.

[Juror Number Two]: It's strictly about income.

The Court: Income. Okay. All right. So here's what I'm going to do. I'm going to have you, because you're here already today and I apologize for that. . . . We don't want anybody to be punished as a result of having to do an obligation, but right now I can't—you saw what happened yesterday. I had one alternate and she had to skedaddle because she was ill so I had to put it off.

So I'm going to leave you in place today for deliberation purposes. We'll see how things go throughout the course of the day . . . . but since you're here already I'm going to ask you to continue with the deliberations with the rest of the jury. Okay.

Guys, you have any questions for Juror Number Two? No?

[Defense Counsel]: I have nothing.

Under these circumstances, we find no abuse of discretion in the court's decision to permit Juror Number Two to continue deliberating for the day. The juror stated her request to be excused was unrelated to the deliberations, and the

juror was available to continue deliberations that day. Neither Juror Number Two nor defense counsel objected. We find no evidence the court's handling of the request was coercive in any manner. To the contrary, the court explained it would revisit the issue at the end of the day if necessary. Thus, Juror Number Two understood that if the jury did not reach a verdict by the end of the day, her request to be excused would be reconsidered by the court. The court's decision not to excuse Juror Number Two does not warrant a new trial.

B.

Defendant also argues the court erred by instructing the jury it was obligated to reach a unanimous verdict after it reported it was deadlocked. When a jury declares it is unable to reach a unanimous verdict, "the decision whether to grant a mistrial turns on whether the duration of the deliberations balanced against the length of the trial and the complexity of the proofs shows the jury has made a good-faith effort to reach a sustainable verdict." State v. Gleaton, 446 N.J. Super. 478, 514 (App. Div. 2016) (quoting State v. Dorsainvil, 435 N.J. Super. 449, 481 (App. Div. 2014)). If, after weighing these factors, a court "is not satisfied that all possibilities of reaching a verdict have been exhausted," it "may send a jury back for further deliberations." State v. Harris, 457 N.J. Super.

33

34, 50 (App. Div. 2018) (quoting State v. Carswell, 303 N.J. Super. 462, 478 (App. Div. 1997)).

However, when a trial court "instruct[s] a jury that reports being deadlocked, [it] must be especially vigilant to avoid communicating a results-oriented message that could be perceived as intolerant of dissent and antagonistic to the free expression of strongly held beliefs that may not be shared by a majority of the deliberating jurors." Gleaton, 446 N.J. Super. at 515 (quoting Dorsainvil, 435 N.J. Super. at 481). An instruction that impresses upon the jury a need to reach a unanimous verdict is considered coercive. See State v. Figueroa, 190 N.J. 219, 227, 240-43 (2007) (holding a court's supplemental charge that it would be around all weekend and "as long as it takes [the jury] to go through this process" was coercive because it implied the jury would have to reach a unanimous verdict).

Ideally, before a court directs a jury to continue deliberating after deadlock claims, it should provide the jury with a Czachor[4] charge. See State v. Ross, 218 N.J. 130, 143-45 (2014); State v. Johnson, 436 N.J. Super. 406, 423 (App. Div. 2014). The charge instructs each juror to "deliberate with a view to reaching an agreement," and to "decide the case for [him or herself] . . . after an

---

[4]  State v. Czachor, 82 N.J. 392 (1980).

impartial consideration of the evidence with [his or her] fellow jurors." Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013). The instruction further explains jurors should "not hesitate to re-examine [their] own views and change [their] opinion if convinced it is erroneous," but cautions that jurors should "not surrender [their] honest conviction[s] as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors, or for the mere purpose of returning a verdict." Ibid. The number of times a court may instruct a jury using the Czachor charge is within the court's sound discretion. See Figueroa, 190 N.J. at 235; State v. Czachor, 82 N.J. 392, 406-07 (1980).

Here, the jury reported it was deadlocked after deliberating approximately two hours and ten minutes. Instead of reading the jury the Czachor charge, the court told the jurors, "You have an obligation to deliberate and to reach a unanimous verdict. That's your obligation. I'm going to send you back in. I'm going to ask you to continue your deliberations." Defense counsel objected to the court ordering continued deliberations. Thirty-seven minutes after the court instructed the jurors they had an "obligation to deliberate and to reach a unanimous verdict," the jury returned a verdict.

35

The court did not abuse its discretion by sending the jury back to deliberate, but it erred by instructing the jury it was obligated to reach a unanimous verdict. The instruction was improperly coercive, see Figueroa, 190 N.J. at 240-43, and wholly inaccurate. A jury has no obligation to reach a unanimous verdict, and no individual juror has an obligation to reach a verdict agreeable to his or her fellow jurors.

The State argues language consistent with the Czachor charge was included in the court's initial charge to the jury and that we may presume the jury understood and faithfully complied with the trial court's initial instructions. That argument is unavailing, however, because we may also presume the jury honored the court's unequivocal direction, provided in response to the jury's report of a deadlock, that it was obligated to reach a unanimous verdict. See State v. Miller, 205 N.J. 109, 126 (2011); see also Figueroa, 190 N.J. at 241 (rejecting the State's argument the trial court's proper instruction of the Czachor charge a day earlier sufficiently counteracted the coercive nature of the court's instructions to the jury when it reported it was deadlocked).

We are convinced the court's erroneous instruction was clearly capable of producing an unjust result. The instruction imposed an obligation on the jury that is inconsistent with each juror's duty not to render judgment on the evidence

and defendant's guilt "for the mere purpose of returning a verdict." The instruction was improper and coercive. It alone requires reversal of defendant's convictions.

V.

Because we reverse and remand for a new trial, it is not necessary to address defendant's claim the court erred by imposing consecutive sentences on defendant's convictions for unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1), without making findings as to each of the factors pertinent to imposition of consecutive sentences established in State v. Yarbough, 100 N.J. 627, 643-44 (1985). We note only that if defendant is convicted of multiple offenses following his retrial, imposition of consecutive sentences must be based on an analysis of each of the Yarbough factors and must be supported by findings of fact and conclusions of law in accordance the Yarbough standard. Cf. State v. Cuff, 239 N.J. 321, 350-52 (2019) (reversing the imposition of a consecutive sentence because the court failed to make findings supporting the sentence under Yarbough).

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION